IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 09-22617-CIV-GRAHAM/TORRES

FDIC, as Receiver for BANKFIRST, a
South Dakota state bank

        Plaintiff,

v.

SAVOY HOTEL PARTNERS, L.L.C.,
a Florida limited liability company,
ABRAHAM I. WERJUKA, an individual,
MONARCH HOTELS AND RESORTS,
INC., a Florida corporation, and SLO FUNDING
LLC, a Delaware limited liability company,

        Defendants.

_____

SAVOY HOTEL PARTNERS, L.L.C., a Florida
limited liability company,

        Counter-Plaintiff,

v.

FDIC, as Receiver for BANKFIRST, a South
Dakota state bank, MARSHALL BANKFIRST
CORP., a registered bank holding company, THE
MARSHALL GROUP, a Delaware corporation,
and MARSHALL FINANCIAL GROUP, LLC, a
Delaware limited liability company,

        Counter-Defendants.

_____

**RULE 12.1 CIVIL RICO CASE STATEMENT SUBMITTED ON BEHALF
OF DEFENDANT/ COUNTER-PLAINTIFF SAVOY HOTEL PARTNERS, L.L.C.**

Defendant/Counter-Plaintiff Savoy Hotel Partners, L.L.C., a Florida limited

liability company ("SHP"), through their counsel and pursuant to Rule 12.1 of the Local

Rules of the Unites States District Court for the Southern District of Florida, hereby

submits its Civil RICO Case Statement (the "RICO Case Statement") in the above-captioned action.

## <u>INTRODUCTION</u>

As set forth in SHP's Second Amended Answer filed May 23, 2008 (the "Counterclaims") this action arises from an egregious and wide-spread scheme of mortgage and other lending fraud, including the origination of numerous pre-development loans around the country, and particularly in Florida.  The scheme began as early as 1999, when enterprise member Dennis A. Mathisen purchased the investment bank Miller & Schroeder and renamed it The Marshall Group.  Operating in a grey are of the market, The Marshall Group originated and participated a variety of loans for hard to finance projects.  Using a network of brokers and appraisers that they directed and controlled, Mathisen and The Marshall Group, along with its affiliates Marshall Financial Group, LLC (and or its predecessor-in-interest) and Marshall Investments Corporation, would target potential borrowers and fraudulently induce them to do business with them.

Mathisen, The Marshall Group, its affiliates and their network of brokers and appraisers were willing to induce borrowers to take out loans not justified by the real value of the collateral because they would hold none of the risk.  Indeed, The Marshall Group used inflated appraisals and other misrepresentations and material omissions to fraudulently induce other banks to purchase these loans.  By participating 100% of the debt, Mathisen, The Marshall Group, its affiliates and their network of brokers and appraisers, could generate enormous fees for themselves without regard to the integrity of the product they were selling.

However, because The Marshall Group is an unregulated investment bank, there were a limited number of borrowers and participants that would agree to do business through them.  Accordingly, in or about 2005, Mathisen and his Marshall entities used the proceeds of their conduct to form Marshall BankFirst, Corp. and purchase BankFirst, a state-chartered, FDIC insured bank.  BankFirst was purchased for the specific purpose of attracting more business – from borrowers and participants – through the appearance of legitimacy conferred by the fact that it was "regulated."  However, notwithstanding BankFirst's status as a regulated bank, Mathisen, the Counter-Defendants, their affiliates and network of brokers continued to do business in precisely the same corrupt and illegal way they had before they purchased BankFirst, only now they all used their affiliation with BankFirst as a cover to bolster their credentials as a legitimate lending operation.[1]

From 2005 forward, the Marshall Defendants used BankFirst to fraudulently induce loans from borrowers who falsely believed BankFirst and the Marshall Defendants were operating legitimately, and then lied about the material facts about those loans in order to pawn them off on misinformed "participating" banks.  No different than the garden variety "sub-prime" mortgage brokers that have devastated the United States economy – and have been called to account by courts across the country, – the Marshall Defendants and their executives and principals enriched themselves through this fraudulent loan scheme by charging exorbitant fees to the borrowers and participating banks, while retaining little of the loan risk themselves.

---

[1] The Counter-Defendants, BankFirst, Marshall BankFirst Corp., The Marshall Group and Marshall Financial, L.L.C. are also sometimes referred to as the "Marshall Defendants".  As discussed in more detail below, at all material times, the Marshall Defendants shared employees and officers.  The employees, letterhead, and company names were used interchangeably in meetings, communications and representations.

SHP, the borrower on the "Savoy Loan"  -- a $39.5 million pre-development loan for the re-development of the Savoy Hotel on South Miami Beach, as well as another nearby parking lot (the "Property") --  was one of the enterprise's many victims.  First, in originating the Savoy Loan, BankFirst materially misrepresented that it could legally proceed without financial documentation and that it was willing to do so, did not disclose that it was illegal for it to do so, or that in order to do so it would misrepresent the facts concerning SHP's and the Property's financial condition to the participants in the Savoy Loan (the "Participants") and its level of due diligence into the same.  Moreover, it misrepresented that at the end of the Savoy Loan it would be willing and authorized to extend and/or refinance the Loan, including by purportedly negotiating in good faith with a financially sound and highly successful developer offering to refinance the note with BankFirst at full value.

As the Savoy Loan was approaching maturity, however, the fraudulent loan scheme had already resulted in federal and state regulators descending upon the Counter-Defendants, especially BankFirst, forcing them to stop underwriting, participating, and servicing loans through BankFirst.  Obviously concerned about the massive legal exposure associated with their unraveling scheme, for over eight months the Counter-Defendants and other Enterprise Members concealed from certain employees, as well as SHP, other borrowers, and participating banks the aggressive regulatory intervention caused by their fraudulent conduct and their resulting inability to continue doing business.  As a result, at the time the Savoy Loan reached maturity, those BankFirst employees dealing with SHP repeatedly represented that they were prepared to extend the

Savoy Loan, provide the construction financing that was originally anticipated when the Savoy Loan was issued, and forebear from any foreclosure.  Based on these representations, SHP elected not to pursue other exit alternatives, and, in fact, validly extended the Savoy Loan for six months in accordance with its terms.

Through the conduct and the acts and omissions set forth in the Counterclaims and summarized herein the Counter-Defendants along with the other Enterprise Members orchestrated and perpetuated their fraudulent scheme to the ultimate detriment and injury of SHP, the borrowers in the South Florida Loans[2] and other loans, as well as the participants in these and other loans.[3]

### ANSWERS TO RULE 12.1 QUESTIONS

**1.     State whether the alleged unlawful conduct is in violation of 18 U.S.C. §§ 1962(a), (b), (c) and/or (d) or §§ 772.101(1), (2), (3) and/or (4) Fla.Stat.  If you allege violations of more than one subsection of § 1962 or § 772.103, each must be treated or should be pled as a separate RICO claim.**

**ANSWER to 1:**  The unlawful conduct alleged in SHP's Counterclaims is in violation of Fla. Stat. §§ 772.103(1), (2), (3) and (4).  Although the claims under Sections 772.103(1)-(3) were pled together as Count I of the Counterclaims, each claim was treated separately.  (See Counterclaims at ¶¶ 97-113).  Section 772.103(4) was pled

---

[2] The South Florida Loans are those loans, beyond the Savoy Loan, specifically originated and participated by Counter-Defendants with the specific assistance of the Enterprise Members defined below.  They include, the "Key West Loan" to develop a dock in Key West with the inflated valued of $10 million dollars, the Hollywood Loan wherein the borrowers were induced by an inflated appraisal of their raw land to take out a teaser loan by Counter-Defendants in the hope of later participation, the "Marathon Loan" for a KOA trailer park, and the "Beach House", "Surf Side" and "Sunny Isles" loans.  The South Florida Loans nearly all went into default or were otherwise non-performing.

[3] SHP is specifically aware of more than seventy-three loans originated and participated by the Counter-Defendants and other Enterprise Members, most in default or otherwise non-performing.

separately from the other subsections of Section 772.103, as Count II of the

Counterclaims.  (See Counterclaims at ¶¶ 114-120).  To the extent that Fla. Stat. §§

772.103(1)-(3) must be re-pled separately, SHP is prepared to amend its Counterclaims

accordingly, and to add, among other things, the supplemental details set forth throughout

this case statement.

**2.     List each defendant and separately state the misconduct and basis of liability for each defendant.**

 **ANSWER to 2:**  The Counter-Defendants currently named in the Counterclaims

include, BankFirst, formerly a South Dakota state bank now in federal receivership,

Marshall BankFirst Corp., a registered bank holding company, The Marshall Group, a

Delaware Corporation, and Marshall Financial Group, LLC, a Delaware Limited Liability

Company (the Marshall Counter-Defendants are in some cases referred to collectively as

the "Marshall Defendants").  SHP will seek to amend its Counterclaims to include as

additional Counter-Defendants certain wrongdoers listed in Question 3 below; namely

Dennis Mathisen, Scott Anderson, Michael Hayes and Ronald Sweet.[4]

 As set forth in more detail below, each of the Counter-Defendants were

responsible for orchestrating a wide-ranging scheme of mortgage and other lending fraud

to extract enormous fees and other monies in exchange for originating and participating

out hundreds of pre-development loans around the country, and particularly in Florida,

including, among many others, the $39 million Savoy Loan and other South Florida

Loans.[5]  The pre-development loans at issue where short-term, high interest rate loans

---

[4]   All references to the Counter-Defendants from this point forward assumes the inclusion of the four proposed Counter-Defendants.

[5]   The South Florida Loans include the "Hollywood Loan" and the "Key West Loan" specifically alleged in the Counterclaims.  (See Counterclaims ¶¶ 92-96).  Any

designed to "cover" pre-development expenses for entities that could not yet qualify for traditional construction financing. While the ostensible goal of these pre-development loans was for the borrowers to eventually qualify for traditional construction financing – financing that BankFirst and the Marshall Defendants routinely promised to provide – , most ended in default with both the borrowers and participants walking away empty handed.

To carry out this fraudulent scheme, however, the Counter-Defendants, needed assistance. Together with a host of other wrongdoers, named in the Counterclaims as Enterprise Members, the Counter-Defendants formed an organization through an association in fact with the common and continuing purpose of defrauding SHP and other borrowers, as well as participating banks, in order to enrich themselves and the Enterprise Members at their victims' expense. As part of their association with the enterprise, the Counter-Defendants participated in the affairs of the enterprise and conducted the activities of the enterprise through a pattern of criminal activity set forth in Question 5 below.

In the initial phases of the scheme, The Marshall Group, its predecessor-in-interest Marshall Investment Corporation, and Marshall Financial Group, LLC acted as an independent investment bank, participating out loans for profit. Even then, the loans

---

amendment of the Counterclaims will address the additional South Florida Loans. The amended pleading would also refine the discussion of the Key West Loan to include the fact that it had an A Note and a subordinated B note and was participated to other banks. After the Key West Loan failed, the B Note holders ousted BankFirst as lead lender and were prepared to bring suit against it before BankFirst settled with the borrower and B Note participants. BankFirst and the Marshall Defendants are also responsible for numerous other failed pre-development and other loans throughout the country – Counter-Plaintiffs have identified. At the time it was taken over by the FDIC, $62 million of BankFirst's $83 million loan portfolio was at least 90 days past due.

originated by the Marshall Defendants were characterized by the inflated value of the collateral, even in the face of contrary evidence concerning the same and the provision of knowingly false information to participants.[6]

In or about late 2004, Dennis Mathisen and others working for or with the Marshall Defendants, launched a plan to gain control of BankFirst, a state-chartered and federally insured bank, as a primary mechanism to further their fraudulent scheme. In January 2005, Mathisen used his holding company Marshall BankFirst Corp. to acquire BankFirst. According to the Counter-Defendant's own executives, the purpose of this acquisition was to provide the Marshall Defendants with a legitimate "cover" so that they could induce additional borrowers and participants to agree to originate and participate in wholly unjustified and undocumented loans. The end goal of this scheme was for the Marshall Defendants, and those individuals who owned and controlled them, to continue earning excessive and usurious fees and interest with virtually no risk to themselves. The addition of BankFirst to the Marshall family gave the Marshall Defendants the

---

[6] For instance, the "Le Nature's Loan" was originated and participated by Marshall BankFirst Corp., The Marshall Group, and Marshall Financial, Inc. in early 2005 for the purpose of allowing Le Nature's, Inc. to lease, and potentially buy, four lines of bottling equipment for a new plant. Certain participants, including MB Financial Bank, brought suit against the Marshall entities for fraudulent inducement, negligent misrepresentation and breach of the participation agreement arising from the Marshall entities' misrepresentations and material omissions to NB Financial about the quality of the underlying loan. Representatives of the Marshall entities repeatedly told MB Financial that they had direct access to Le Nature's CEO and extensive knowledge about its financial condition. Moreover, the Marshall entities repeatedly assured MB Financial that the representations made in the confidential information memorandum were correct. Contrary to these assurances, the representations in the CIM were false, the value of the collateral – the bottling equipment – was $84-94 million dollars lower than stated in the CIM. Moreover, the Marshall entities allegedly were informed that the value of the collateral was grossly inflated by someone at Le Nature's at or about the time of origination but neither followed up themselves, nor shared the information with participants. Le Nature's ultimately filed for bankruptcy protection.

appearance of legitimacy that enabled these inducements because BankFirst was an insured lending institution bound by strict state and federal banking regulations and subject to regular bank examinations – which suggested that BankFirst was, and would continue, following safe and sound lending practices.

To further their fraudulent fee generating scheme, the Counter-Defendants made numerous misrepresentations and engaged in a pattern of criminal activity.  Among other things enumerated in more detail through this RICO Case Statement, the Counter-Defendants misrepresented that BankFirst was a legitimate bank that could nonetheless proceed with loans without any of the documents normally required to secure a large-scale commercial loan, and could participate such loans to other banks.  However, the Counter-Defendants and the Enterprise Members with which they were conspiring did not reveal that in order to provide these loans they were required to generate phony financial information and appraisals that greatly inflated the financial wherewithal and experience of the relevant developer, the business condition and potential of the subject property, and the value of the collateral.

Shortly after the Marshall Defendants acquired BankFirst, the Counter-Defendants began the process of negotiating and originating the Savoy Loan, as well as the other South Florida Loans.  Like the Savoy Loan, the other South Florida Loans were identified and secured through the same handful of corrupt brokers, appraised by the same corrupt appraisers and most of these loans ended in default or otherwise became non-performing.  While the Savoy Loan included an explicit contractual extension option, BankFirst did not disclose that its failure to obtain the fundamental documentation necessary to originate the Savoy Loan in the first instance would make it

impossible for BankFirst to honor its contractual obligation.  As early as late 2006, the Federal Reserve began an investigation into BankFirst that ultimately prevented BankFirst from originating any new loans because of extreme deficiencies in BankFirst's policies and procedures for loan originations, as well as for renewing, extending, and/or modifying existing loans.

Yet, even as the scheme began to unwind, BankFirst made every effort to keep up appearances to the detriment of SHP, numerous other borrowers and participant banks. Among other things, it sought to evade the restrictions imposed by the Federal Reserve by moving the loan origination group out of BankFirst and into the Marshall Group, a non-banking entity not subject to regulation by the Federal Reserve.  Although, BankFirst voted to cease its loan participation business in January 2007 in response to scrutiny from its regulators, it failed to disclose this material fact to the participants, and actually continued to sell participation interests in the Savoy Loan after January 2007.  Moreover, BankFirst did not alert participants that banking regulators had imposed any restrictions on its ability to conduct its business until one of the Participants contacted BankFirst with questions and concerns after independently learning about the August 2, 2007 written agreement entered into between BankFirst, Marshall BankFirst Corp. and the Federal Reserve.

With respect to pending loans still serviced by BankFirst and subject to regulatory review, BankFirst admittedly implemented stricter policies and procedures in an effort to cover up the inadequacies and fraudulent practices reflected in its loan files.  In response to the ongoing regulatory investigation of BankFirst at that time, BankFirst implemented more stringent standards for documenting loans and imposed additional conditions on the

extension option exercised by SHP, going beyond those conditions called for in the Savoy Loan Documents.  Given the close examination of BankFirst's loan files at that time, BankFirst executives "understood" that it was necessary to resolve all issues with respect to the inadequate documentation in the Savoy Loan file, among others, before they could grant SHP its properly-exercised extension option.

BankFirst:  BankFirst, based in Sioux Falls, South Dakota, was a state chartered bank and a member of the Federal Reserve System.  At all material times, BankFirst was owned and controlled by Marshall BankFirst Corp. and the affiliated companies The Marshall Group and Marshall Financial Group, LLC.  Dennis Mathisen, the Chairman of Marshall BankFirst Corp., arranged the acquisition of BankFirst in January 2005 to act as a cover and provide legitimacy for the Marshall Defendants' already ongoing scheme of mortgage and lending fraud.

Without limitation, BankFirst held itself out as a legitimate bank that complied with state and federal regulatory guidelines and lending practices when in fact it regularly originated commercial mortgages and other financing without any reasonably inquiry into, or regard for, the borrower's net worth or finances or the underlying value or condition of the property.  These practice likewise violated federal and state banking laws, regulations and standards.  With respect to such loans, BankFirst, acting in concert with the other Counter-Defendants, participated in and directed the affairs of the enterprise, and engaged in a pattern of criminal activity including regularly fabricating due diligence materials and preparing and distributing materially false and misleading prospectuses, appraisals, marketing and other materials to mislead borrowers, banking regulators and participating banks to which they sold portions of the loans.  In addition,

BankFirst misrepresented itself and its fundamental capabilities to borrowers by inducing them to take out wildly speculative loans, so that it could charge exorbitant and usurious fees and in the hopes that BankFirst could turn even the most outlandish development project into a new opportunity to originate a large participated loan at no risk to itself. Through this scheme, BankFirst secured lucrative fees and interest from originating, participating out and servicing these loans, and held virtually none of the risk associated with these loans.

Without limitation, BankFirst knowingly participated in predicate acts cognizable as a pattern of criminal activity under Fla. Stat. Ann. § 772.102 and18 U.S.C. § 1861 as incorporated therein and/or acts in furtherance of the fraudulent schemes alleged in the Counterclaims, including, but not limited to:

- Using the mail and wires to engage in an egregious and wide-spread scheme of fraudulent and predatory mortgage and other lending practices, including the origination and participation of the Savoy Loan, as well as the other South Florida Loans;

- Using the mail and wires to perpetrate the false and fraudulent perception that BankFirst was a legitimate bank, including through the maintenance of a website www.marshallbankfirst.com;

- Disseminating fabricated due diligence materials and materially false and misleading prospectuses, marketing and other materials to mislead banking regulators and the participating banks to which they sold such loans;

- Providing fraudulent due diligence materials, prospectuses and other materials to the participating banks to which they sold such loans falsely in certain instances depicting such loans as thoroughly researched and conservative;

- Using the mail and wires to attempt to misappropriate property;

- Securing control over monies and opportunities that they then appropriated, through use of the mail and wires, for their own benefit;

- Using the mail and wires to originate commercial real estate loans irrespective of the borrower's financial condition, or the underlying property or business value, therefore, neglecting their obligation to verify such information;

- Using the mail and wires to originate commercial real estate by obtaining false, inaccurate or inflated appraisals;

- Using the mail and wires to fraudulently induce SHP in pursuing an ambitious redevelopment plan by materially: (a) misrepresenting that BankFirst could provide necessary financing irrespective of the financial condition of the property, SHP, or SHP's investors; (b) failing to disclose that any such loan would violate federal and state banking laws, regulations and standards, as well as the representations and warranties BankFirst made in the participation agreements it entered into with participating banks; (c) failing to disclose that the Savoy Loan would also require dissemination of materially false and misleading financial information, prospectuses and other materials as part of its syndication to participating banks; (d) failing to disclose that these misrepresentations and omitted facts rendered it highly unlikely that BankFirst would or could, as promised and contractually obligated itself, agree to extend, restructure, and/or refinance the Savoy Loan at maturity to permit SHP to complete its redevelopment plan; (e) failing to disclose that BankFirst intended to use foreclosure as the exit strategy for the Savoy Loan;

- Using the mail and wires to misrepresent to SHP that it could legally obtain the Savoy Loan without contributing any further equity, or providing financial documentation, such as tax returns, frequently required to secure such pre-development financing;

- Using the mail and wires to misrepresent to SHP that it could, would and did extend the Savoy Loan, when, in fact, it could not extend or refinance without the approval of the Participants;

- Using the mail and wires to misrepresent to SHP that it could, would and did extend the Savoy Loan when, in fact, it could not extend or refinance without the approval of the Participants, which it would not seek out of concern that it would otherwise expose its breaches of representations and warranties in the Participation Agreements;

- Using the mail and wires to misrepresent to SHP through Eric Hadar, acting on his own behalf and as an agent of SHP, that it could and would refinance the Savoy Loan with him at par value when, in fact, it could not refinance without the approval of the Participants, which it would not seek out of concern that it would otherwise expose its breaches of representations and warranties in the participation agreements and indeed did not seek instead using the mails and wires to wrongfully inform the Participants that the borrower and guarantor were "unwilling[] to provide any alternatives or repay the loan in full";

13

- Using the mail and wires to misrepresent to SHP through Hadar, acting on his own behalf and as an agent of SHP, that it was unnecessary to execute an agreement specifically forestalling foreclosure while he negotiated with BankFirst to refinance the Savoy Loan at par value because BankFirst intended to move ahead with refinancing and would not foreclosure; and

- Using the mail and wires to misrepresent to the borrowers in the Hollywood Loan that it would: (a) provide construction financing if the borrowers first accepted a high interest rate, short-term teaser loan; (b) provide or, alternatively, assist in finding alternative construction financing if the borrowers paid fees and other consideration to extend the high interest rate, short-term teaser loan on multiple occasions over a two-year period; (c) be flexible in allocating money for pre-development if the borrowers accepted the high interest rate, short-term teaser loan; (d) allocate all of the funds designated for pre-development under the high interest rate, short-term teaser loan.

As set forth in more detail below, these acts constitute violations of Fla. State. Ann.

§ 772.103(1)-(4).

<u>Marshall BankFirst Corp.</u>:  Marshall BankFirst Corp. is a registered bank holding company that operated its primary business through BankFirst, which originated and serviced the Savoy Loan and other participation loans marketed and sold by The Marshall Group and Marshall Financial Group, LLC.  At all material times, Marshall BankFirst Corp. and The Marshall Group were under the common ownership of a group of investors lead by Dennis Mathisen.  The employees of BankFirst also held positions with Marshall BankFirst Corp., communicated with the borrowers and participants from Marshall BankFirst Corp. email addresses, and at various times were paid directly by Marshall BankFirst Corp., as opposed to BankFirst.  Materials sent to prospective borrowers and prospective participants, including loan documents and the critical Confidential Information Memoranda or "CIM"s, which set forth detailed information about each loan and development project, were transmitted on "Marshall BankFirst" letterhead.  Most of the employees

of BankFirst and Marshall BankFirst Corp. operated from the same physical location, office space located in downtown Minneapolis, Minnesota.

Marshall BankFirst Corp., acting in concert with the other Counter-Defendants, participated in and directed the affairs of the enterprise, and engaged in a pattern of criminal activity including regularly fabricating due diligence materials and preparing and distributing materially false and misleading prospectuses, appraisals, marketing and other materials, and directing appraisers such as Enterprise Member Frank Hornstein to generate inaccurate, inflated appraisals of the collateral to mislead borrowers, banking regulators and participating banks to which they sold portions of the loans.

Without limitation, Marshall BankFirst Corp. knowingly participated in predicate acts cognizable as a pattern of criminal activity under Fla. Stat. Ann. § 772.102 and 18 U.S.C. § 1861 as incorporated therein and/or acts in furtherance of the fraudulent schemes alleged in the Counterclaims, including by participating directly and indirectly in all of the acts committed by BankFirst and described in more detail above.  And, as set forth in more detail below, these acts constitute violations of Fla. State. Ann. § 772.103(1)-(4).  Moreover, Marshall BankFirst Corp. specifically used the mail and wires to acquire and maintain an interest in BankFirst in violation of Fla. Stat. Ann. § 772.103(2).

The Marshall Group:  The Marshall Group is a Delaware corporation and affiliate of Marshall BankFirst Corp. that at all material times marketed and sold the participation loans originated and serviced by Marshall BankFirst Corp. and BankFirst including, at various times, the Savoy Loan.  The Marshall Group and

Marshall BankFirst Corp. were under the common ownership of a group of investors lead by Dennis Mathisen.  Despite the fact that the sales team was "officially" part of a separate company, at all times they operated seamlessly as part of the same team and for the common purpose of originating and participating out loans to generate fee and interest income.  Employees of The Marshall Group had Marshall BankFirst Corp. email addresses.  Most of the employees of The Marshall Group operated from the same physical location as the employees of BankFirst and Marshall BankFirst Corp., office space located in downtown Minneapolis, Minnesota.  In the early stages of the scheme and then later in 2007, to avoid scrutiny from the Federal Reserve investigation, loan origination was also conducted through The Marshall Group.

The Marshall Group, acting in concert with the other Counter-Defendants, participated in and directed the affairs of the enterprise, and engaged in a pattern of criminal activity including regularly fabricating due diligence materials and preparing and distributing materially false and misleading prospectuses, appraisals, marketing and other materials to mislead borrowers, banking regulators and participating banks to which they sold portions of the loans.

Without limitation, The Marshall Group knowingly participated in predicate acts cognizable as a pattern of criminal activity under Fla. Stat. Ann. § 772.102 and 18 U.S.C. § 1861 as incorporated therein and/or acts in furtherance of the fraudulent schemes alleged in the Counterclaims, including by participating directly and indirectly in all of the acts committed by BankFirst and Marshall BankFirst Corp. and described in more detail above.  And, as set forth in more detail below, these acts constitute violations of Fla. State. Ann. § 772.103(1)-(4).  Moreover, The Marshall Group

specifically used the mail and wires to acquire and maintain an interest in BankFirst in violation of Fla. Stat. Ann. § 772.103(2) and conspired to do the same in violation of § 771.103(4).

Marshall Financial Group, LLC:  Marshall Financial Group, LLC is a Delaware limited liability company that marketed and sold the participation loans originated and serviced by Marshall BankFirst Corp. and BankFirst including, at various times, the Savoy Loan.  Marshall Financial Group, LLC was wholly owned by The Marshall Group and, thus along with Marshall BankFirst Corp., was under the common ownership of a group of investors lead by Dennis Mathisen.  On information and belief, employees of Marshall Financial Group, LLC at all times worked with The Marshall Group and Marshall BankFirst Corp. to originate and participate out loans for fees.  Similarly, employees of Marshall Financial Group, LLC had Marshall BankFirst Corp. email addresses.  Most of the employees of Marshall Financial Group, LLC operated from the same physical location as the employees of The Marshall Group, BankFirst and Marshall BankFirst Corp., office space located in downtown Minneapolis, Minnesota.

Marshall Financial Group, LLC, acting in concert with the other Counter-Defendants, participated in and directed the affairs of the enterprise, and engaged in a pattern of criminal activity including regularly fabricating due diligence materials and preparing and distributing materially false and misleading prospectuses, appraisals, marketing and other materials to mislead borrowers, banking regulators and participating banks to which they sold portions of the loans.

Without limitation, Marshall Financial Group, LLC knowingly participated in

17

predicate acts cognizable as a pattern of criminal activity under Fla. Stat. Ann. §

772.102 and 18 U.S.C. § 1861 as incorporated therein and/or acts in furtherance of the

fraudulent schemes alleged in the Counterclaims, including by participating directly

and indirectly in all of the acts committed by BankFirst, Marshall BankFirst Corp. and

The Marshall Group and described in more detail above.  And, as set forth in more

detail below, these acts constitute violations of Fla. Stat. Ann. § 772.103(1)-(4).

Moreover, Marshall Financial Group, LLC specifically used the mail and wires to

acquire and maintain an interest in BankFirst in violation of Fla. Stat. Ann. §

772.103(2) and conspired to do the same in violation of § 771.103(4).

**3.      List the wrongdoers, other than the defendants listed above, and separately state the misconduct of each wrongdoer.**

        **ANSWER to 3**: Beyond the four Counter-Defendants specifically mentioned in

response to Question 2 above, the following wrongdoers are currently set forth in the

Counterclaims as "Enterprise Members": Ronald Sweet; Melanie Tanone, James Lund,

Michael Hayes, Joel Fischer, Richard Burnton, Frank Hornstein, CMA Development

Group, and MOC Capital Partners, as "Enterprise Members".[7]  SHP will seek to amend

its Counterclaims to include additional wrongdoers – Dennis Mathisen, Scott Anderson,

Henry Rodstein (deceased) and HR Mortgage and Realty Company – as Enterprise

Members.[8]

        Wrongdoers Who SHP Proposes Adding As Counter-Defendants:

---

[7]   The Counterclaims also name a number of loan participants as Enterprise Members. With the benefit of discovery, SHP may omit these individuals and entities from the list of Enterprise Members in an amended pleading.

[8]   As noted above, Dennis Mathisen and Scott Anderson, will also be added as Counter-Defendants.  Both Mathisen and Anderson, along with the other Counter-Defendants and proposed Counter-Defendants (Sweet and Hayes), were responsible for conducting and participating in the conduct of the enterprise.

<u>Dennis Mathisen</u>:  Dennis Mathisen was Chairman and Chief Executive Officer of Marshall BankFirst Corp. the Minneapolis-based bank holding company.  In his role as Chairman and CEO, Mathisen acquired BankFirst in January 2005 as a means to cover-up and provide legitimacy for Counter-Defendants' already ongoing scheme of mortgage and lending fraud.  As the head of the investor group that commonly owned Marshall BankFirst Corp. and The Marshall Group, Mathisen in essence owned and controlled those entities, as well as BankFirst and Marshall Financial Group, LLC.  Mathisen, acting in concert with the other Counter-Defendants, participated in and had a role in directing the affairs of the enterprise, engaged in multiple instances of criminal activity to further the scheme.

Without limitation, Mathisen knowingly participated in predicate acts cognizable as a pattern of criminal activity under Fla. Stat. Ann. § 772.102 and 18 U.S.C. § 1861 as incorporated therein and/or acts in furtherance of the fraudulent schemes alleged in the Counterclaims, including by participating directly and indirectly in all of the acts committed by BankFirst, Marshall BankFirst Corp., The Marshall Group and Marshall Financial Group, LLC and described in more detail above.  And, as set forth in more detail below, these acts constitute violations of Fla. Stat. Ann. § 772.103(1)-(4).  Moreover, Mathisen specifically used the mail and wires to acquire and maintain an interest in BankFirst in violation of Fla. Stat. Ann. § 772.103(2) and conspired to do the same in violation of § 771.103(4).

<u>Scott Anderson</u>:  Scott Anderson was, at all relevant times, the President and Chief Operating Officer of Marshall BankFirst Corp.  Through his position at Marshall BankFirst Corp., Anderson controlled the operations of BankFirst.  Among other

things, Anderson was a member of the credit committee that approved the Savoy Loan

and other loans without the appropriate documents and in flagrant disregard of

BankFirst's written policy and general standards of safe and sound lending practice,

despite knowing and being in possession of BankFirst's loan policies.

Moreover, as the economy floundered and BankFirst was unable to find full

participants in the Savoy and other loans, Anderson engineered and approved

BankFirst's policy of "warehousing" portions of loans (wherein participants agreed to

hold on to a participation interest for 90 days) in the event of a shortfall of sales,

knowing that warehousing was questionable practice for evading BankFirst's legal

lending limit that had not been approved by the Federal Reserve and did not clearly

comport with the law.  By warehousing any a portion of a loan BankFirst could not

otherwise sell, BankFirst could proceed to closing with the borrower, allowing

BankFirst to generate fees without regard to whether the loan should have been granted

in the first instance.  Anderson approved closing the Savoy Loan on May 11, 2006,

even though BankFirst was forced to warehouse $10.2 million of the A Note and

$950,000.00 of the B Note because it could not find any long-term buyers.  Unwilling

to be left "on the hook" for these loan amounts, BankFirst continued its selling efforts

and found a series of banks to warehouse these leftover portions for short-term periods

through January 2007.

Notwithstanding the fact Marshall BankFirst's Board of Directors had voted to

cease BankFirst's loan participation business as of January 2007 – as a direct result of

the ongoing Federal Reserve investigation – , Anderson knew of and approved of the

sale of a $10.2 million piece of the A Note to three long-term participants from

Wisconsin on February 6, 2007.  Neither Anderson, nor anyone else at BankFirst

informed the Wisconsin banks about the fact that BankFirst had already been forced

out of the participation business because of its conduct and the poor quality of its

credits.  Anderson was also instrumental in covering up the other draconian restrictions

imposed by the Federal Reserve which stymied BankFirst's ability to modify, extend or

refinance existing loans and to originate any new loans.  Instead, Anderson attempted

to circumvent these restrictions by moving the loan origination group led by Richard

Burnton out of BankFirst and into The Marshall Group, an entity not subject to federal

or state banking regulations.

Without limitation, Anderson knowingly participated in predicate acts

cognizable as a pattern of criminal activity under Fla. Stat. Ann. § 772.102 and 18

U.S.C. § 1861 as incorporated therein and/or acts in furtherance of the fraudulent

schemes alleged in the Counterclaims, including by participating directly and indirectly

in all of the acts committed by BankFirst, Marshall BankFirst Corp., The Marshall

Group, Marshall Financial Group, LLC and Mathisen described in more detail above.

And, as set forth in more detail below, these acts constitute violations of Fla. Stat. Ann.

§ 772.103(1)-(4).  Moreover, Anderson specifically used the mail and wires to acquire

and maintain an interest in BankFirst in violation of Fla. Stat. Ann. § 772.103(2) and

conspired to do the same in violation of § 771.103(4).

Michael Hayes:  Michael Hayes is a Vice President for the Special Assets or

"workout group" of BankFirst.  The Special Assets group was responsible for serving

the Savoy Loan beginning in May 2007, and Hayes along with his team – including

Enterprise Members Joel Fischer and James Lund – was responsible for efforts to cover

up the fraudulent origination of the Savoy Loan.

Without limitation, Hayes knowingly participated in predicate acts cognizable as a pattern of criminal activity under Fla. Stat. Ann. § 772.102 and18 U.S.C. § 1861 as incorporated therein and/or acts in furtherance of the fraudulent schemes alleged in the Counterclaims, including by participating directly and indirectly in all of the acts committed by BankFirst, Marshall BankFirst Corp., The Marshall Group, Marshall Financial Group, LLC, Mathisen and Anderson described in more detail above. Among other things, Hayes specifically used the mails and wires to defraud the Savoy Participant Banks by misrepresenting SHP's willingness to negotiate an alternative to foreclosure and, in doing so, failed to disclose the fact that representatives of BankFirst and the Marshall Defendants had received dozens of inquiries and offers throughout the spring and summer of 2007 – including before the initiation of the foreclosure action – from third parties interested in refinancing or purchasing outright the Savoy Loan.  In one specific instance, Hayes defrauded the Savoy Participant Banks by failing to disclose that representatives of BankFirst and the Marshall Defendants were in negotiations with Eric Hadar, the borrower's agent and chosen partner, to sell "the note and mortgage covering the Savoy."

Despite BankFirst's contention that it certainly "would [have] prefer[red] to find an amicable and reasonable solution" in lieu of foreclosure, the reality is that BankFirst never presented the Participants with any of the alternatives typically available to the workout group with respect to troubled loans – namely extension, modification, forbearance, and/or accepting the deed in lieu of foreclosure.  Indeed, the only option Hayes presented to the Savoy Participant Banks in a June 8, 2007 guidance

request was foreclosure.  After misrepresenting in that memorandum, sent to the Savoy Participant Banks over the wires through BankFirst's "Loan Link" system, that the borrower and guarantor were "unwilling[] to provide any alternatives or repay the loan in full," BankFirst asked the Savoy Participant Banks to authorize the commencement of a foreclosure action.

As set forth in more detail below, these acts constitute violations of Fla. Stat. Ann. § 772.103(1)-(4).

Ronald Sweet:  Ronald Sweet was, at all relevant times, an Executive Vice President of BankFirst and/or Marshall BankFirst Corp. based out of the Atlanta office responsible for identifying, originating and underwriting new loans.  His territory was focused on the southeast United States, particularly Florida where, with the help of Henry Rodstein and other brokers, he become one of BankFirst's top producers, generating roughly $4-5 million in annual fees, and sometimes more, for BankFirst and the Marshall Defendants.  As an originator of loans, Sweet and his team were primarily responsible for due diligence and ensuring that all loans were properly documented and complied with BankFirst's loan policies, as well as applicable law.  Although, with respect to the Savoy Loan, Sweet admitted that he failed to do any due diligence in underwriting the Savoy Loan.

Without limitation, Sweet knowingly participated in predicate acts cognizable as a pattern of criminal activity under Fla. Stat. Ann. § 772.102 and 18 U.S.C. § 1861 as incorporated therein and/or acts in furtherance of the fraudulent schemes alleged in the Counterclaims, including by participating directly and indirectly in all of the acts committed by BankFirst, Marshall BankFirst Corp., The Marshall Group, Marshall

Financial Group, LLC, Mathisen, Anderson and Hayes described in more detail above. Among other things, Sweet had a telephone conversation with Werjuka in or around the time for purportedly extending the Savoy Loan. At that time, Sweet communicated to Werjuka that no formal extension was necessary and that Werjuka need not pay the extension fee so long as negotiations with potential equity partners were moving forward.

Sweet also used the mails and wires to induce Eric Hadar, an agent and the chosen partner of Werjuka, to forego a formal extension and submit a specific offer in order to avoid foreclosure and rescue the development project. Sweet held himself out as the authoritative dealmaker for BankFirst and the Marshall Defendants. During numerous telephone conversations with Hadar, in May and June of 2007, Sweet indicated that BankFirst was not inclined to provide a discount on an all-cash deal at that juncture but that it would be willing to refinance the loan with Hadar at a lower interest rate as a "proxy" for a discount. Sweet went on to suggest that BankFirst loved the deal and would want to remain the lender during the construction phase. Based on these representations, Hadar submitted a term sheet vetted by Sweet. Given the assurances provided by Sweet that the terms would be acceptable – and that Participant approval would not be an obstacle – Hadar moved forward on his investment in SHP. Participant Bank approval was required, but as is now known, was never even solicited. BankFirst never sought to secure Participant Bank approval for Hadar's June 2007 offer because the restrictions imposed by the Federal Reserve prohibited BankFirst from either refinancing the Savoy Loan or providing any new construction lending.

Wrongdoers Who SHP Has Named and/or
Proposes to Name As Enterprise Members:

Melanie A. Tanone:  Melanie Tanone is an Assistant Vice President of

BankFirst and/or Marshall BankFirst Corp. responsible for servicing the Savoy Loan

beginning in or about May 2006 until May 2007.  Tanone also participated in the

ongoing efforts to cover up the fraudulent origination of the Savoy Loan.  Among other

things, in or about February of 2007, Tanone repeatedly sought, and on March 1, 2007

finally obtained, Gary Cohen's signature on a side letter which purported to change the

terms of an extension of the Savoy Loan.  Tanone acknowledged that the side letter

was never approved by the Savoy Participant Banks, that is was neither sent to, nor

signed by the guarantor on the Savoy Loan, Abraham Werjuka (even though it was

addressed to him), and that BankFirst never fulfilled its own obligations under the

purported side letter.  Nevertheless, Tanone, along with others at BankFirst, now

contest SHP's valid extension of the Savoy Loan based on SHP's failure to abide by

the terms of the side letter.  Tanone was also involved in efforts to paper the Savoy

Loan files, months after the loan was closed.

James Lund:  James Lund was a Vice President of BankFirst and/or Marshall

BankFirst Corp. working in the Special Assets group.  Beginning as early as May 2007,

Lund participated in the ongoing efforts to cover up the fraudulent origination of the

Savoy Loan.  Without limitation, Lund participated in conference calls and

corresponded by email with Hadar during May and June 2007 concerning Hadar's

proposed offer.  Lund, among others, led Hadar to believe that his offer would be

accepted and that the Counter-Defendants would not foreclose.  Indeed, on or about

June 11, 2009 Lund asked for and received financial references for Hadar.

Nevertheless, on June 27, 2007, having never gotten back in touch with Hadar after repeated telephone calls, Lund signed a notice of additional default and sent it to SHP.  During this period, Lund also was specifically aware of dozens of inquiries and offers from third parties interested in refinancing or purchasing outright the Savoy Loan – solutions which would have provided an alternative to foreclosure.  On information and belief, Lund never shared these alternatives with the Participants.

Joel Fischer:  Joel Fischer is an Assistant Vice President of BankFirst and/or The Marshall Group (with a Marshall BankFirst Corp. email address) working in the Special Assets group.  Fischer was responsible for servicing the Savoy Loan beginning in May 2007, and he participated in the ongoing efforts to cover up the fraudulent origination of the Savoy Loan.  Among other things, Fischer co-authored the June 8, 2007 guidance request memorandum advising the Savoy Participant Banks that foreclosure was the only option for dealing with the struggling Savoy Loan.  During this period, Fischer was specifically aware of dozens of inquiries and offers from third parties interested in refinancing or purchasing outright the Savoy Loan – solutions which would have provided an alternative to foreclosure and mitigated the injuries suffered by many of the victims of the Counter-Defendants' fraudulent scheme.  Moreover, Fischer misrepresented in the June 8th memorandum that the borrower and guarantor were "unwilling[] to provide any alternatives or repay the loan in full," when Fischer was aware of Hadar's specific proposal, among others, to purchase the Notes.

Richard Burnton:  Richard Burnton was, at all relevant times, the Managing Director of BankFirst's, Marshall Financial Group, LLC's and/or The Marshall Group's commercial real estate group (with a Marshall BankFirst Corp. email address).

Burnton was responsible for originating and participating the Savoy Loan without regard to the value the underlying collateral or the financial wherewithal of the borrower.  He also participated in the ongoing efforts to cover up the origination of the fraudulent Savoy Loan.  As the Managing Director of the Counter-Defendants' commercial real estate group, Burnton agreed to originate the Savoy Loan despite serious personal doubts, as well as known concerns expressed by members of his team, about the quality of the guarantee and the value of the Property.  For instance, in a November 21, 2005 email from Burnton to Ronald Sweet and Amber Shimpa, a member of Sweet's team responsible for originating and documenting the Savoy Loan, Burnton expressed his concern that "[w]e are really leveraging up the land at this stage."  In the same email, Burnton suggested that "[t]his is a stretch with the guarantors. (I assumed they had alot [sic] more liquidity)."  Burnton further worried that "[i]f things went to he#$ . . . . I dont [sic] know if we could get our money back."  Ultimately, Burnton concluded that "[s]ales will throw up on this as structured."  Despite his reservations, on January 4, 2006, Burton encouraged his sales team to "execute on these transactions!" because "the market is watching a- these are very high profile deals."  Burton reminded his team that the deals also "have a major impact on our fee income for the year."  This email was copied to Scott Anderson and Ronald Sweet, among others.

Burnton also participated in telephone calls and emails with Hadar in May and June 2007, inducing Hadar to believe that an offer for the Property or the Savoy Loan would be seriously considered and inducing him to partner with SHP and Werjuka and begin funding its significant shortfall.

27

<u>Frank Hornstein</u>:  Frank Hornstein, MAI, is Vice President of AppraisalFirst Inc., a Florida based appraisal company, responsible for generating inaccurate and/or inflated appraisals for loan collateral at the behest of the Counter-Defendants.  On a short list of BankFirst's preferred appraisers in South Florida, throughout August 2005 Hornstein, acting in concert with Gary Cohen of CMA, manipulated the appraisal for the Property to arrive at an "As Is" market value of $52 million, an increase of more than $4 million dollars over his appraisal of the Property done only 5 months earlier, and a "Prospective Market Value" of $138 million.  Hornstein's August 2005 appraisal assumed the existence of Historic Preservation Board ("HPB") approvals necessary to exploit the Property's excess development rights, which had not yet been secured.

In succeeding months, Hornstein was directed by executives at Marshall BankFirst, including Eric Daly, to commission three additional appraisals further inflating the value of the Property in each instance.  In these appraisals, the value of the Property continued to increase, despite the well publicized deterioration of market conditions for condo-hotels in South Beach, Miami beginning in the first half of 2006.  For instance, in January 2006 Hornstein appraised the Property's prospective market value as $143 million.  By September 2006 Hornstein further inflated the prospective market value by another $20 million appraising it at $163 million.  It was only shortly after the foreclosure in July 2007 that Hornstein's ability to provide an ever increasing value for the property seemed to hit its limit.  At that time, Hornstein determined that the prospective market value had declined by $3 million dollars to $160 million.

<u>CMA Development Group, LLC</u>:  CMA Development Group, LLC ("CMA") is a Florida limited liability company, organized in 2005, that ostensibly provides

financing, equity, development and asset management services to property owners that wish to undertake condominium/hotel conversions, or residential and mixed-use development projects.  Notwithstanding its claims about its broad competencies, CMA was formed for the specific purpose of developing the Savoy Hotel (and to date has had only one other project, also with Werjuka) after its principals induced Werjuka to abandon his modest conversion plan, which was fully sold, in favor of a vastly more risky and ambitious plan that would required origination of the Savoy Loan.

Although CMA purportedly acted on behalf of SHP (whose principal, Werjuka, resided abroad) throughout the relevant period, it was at all times a double-agent for the Enterprise securing SHP as a victim for BankFirst for its own enrichment.  CMA initially earned at $50,000.00 retainer, monthly fees of $20,000.00 per month and an asset management fee of 3% of gross profits, due quarterly. After the Savoy Loan closed CMA began receiving  $100,000.00  in monthly fees until commencement of construction at which point CMA would have been entitled to a balloon payment.

MOC Capital Partners, Inc.:  MOC Capital Partners, Inc. ("MOC") is a real estate investment and brokerage firm with an address at 7000 W. Palmetto Park Rd., Boca Raton, FL,.  MOC, through its owner and founder Gary Cohen, has a long-standing relationship with BankFirst and Ronald Sweet.  MOC was initially hired by SHP and Werjuka to arrange acquisition financing for the Savoy Hotel Property.  Although, the acquisition financing, which closed in June 2005, was not initiated through BankFirst, Mr Cohen was in contact with Mr. Sweet about the Savoy as early as February 21, 2005.  Indeed, on March 7, 2005, Mr. Cohen, through his MOC address e-mail address sent Ronald Sweet Werjuka's financials, which contradict and

undermine the financials that Sweet later used to "document" Werjuka's guarantee for the pre-development loan.  MOC received brokerage fees of  $500,000 upon closing of the Savoy Loan.

Henry Rodstein (deceased):  Henry "Hank" Rodstein was a broker, as well as the President of HR Mortgage and Realty based in Miami Florida.  Well known in Miami as a purveyor of risky pre-construction financing, Rodstein was the broker primarily responsible for the origination of BankFirst's South Florida Loans, nearly all of which are currently in default or otherwise non-performing.  Among other things, Sweet relied on Rodstein to close the deal with perspective participants in the South Florida Loans by showing them the sites in Miami and talking up the strength of the market.  Among other things, Rodstein organized bus tours of Miami real estate for perspective participants from around the country to induce them to fund BankFirst's pre-development loans.  Rodstein knew that BankFirst was providing pre-development financing that no other lender could match because it bore no risk and that BankFirst originated loans without regard for the value of the underlying property or financial wherewithal of the borrower.

Rodstein and his company also played a clandestine role with respect to the Savoy Loan.  Sweet kept Rodstein informed about the status of the Savoy Loan, including, but not limited to, providing Rodstein with particular information concerning BankFirst's willful failure to properly document the Savoy Loan and the guarantee.  Among other things, on July 10, 2006 Sweet sent Rodstein an email evidencing the understanding between CMA's Gary Cohen and Sweet that tax returns would not be provided to support the guarantee from Werjuka.  The precise purpose

and extent of Rodstein's involvement with the Savoy Loan is unknown, and may remain that way.  On information and belief, as a result of mounting pressures arising from the increasing failures of the portfolio of loans he had brokered, on November 6, 2006, Henry Rodstein committed suicide.

HR Mortgage and Realty:  Rodstein's company HR Mortgage and Realty Company, with an Suite 729, 444 Brickell Avenue, Miami Florida, at all material times worked closely with BankFirst, the Marshall Defendants and Sweet to originate the South Florida Loans.  From December 2006 through at least August 2007, HR Realty and Mortgage, through broker Perry Levine, continued to operate on behalf of BankFirst, the Marshall Defendants, Sweet and others to keep tabs on the Savoy Loan, to derail SHP's efforts to successfully partner with new investors and then offer alternative buyers for the notes post-foreclosure.

4.     **List the victims, and separately state when and how each victim was injured.**

**ANSWER to 4:**  As set forth in more detail below SHP (including its principal Abraham Werjuka), Eric Hadar, the Participants in the Savoy Loan, borrowers and participants in the other South Florida Loans and other loans throughout the country, as well as the FDIC and BankFirst depositors were all victims of and injured by the fraudulent lending scheme at issue herein.

SHP:  SHP was first injured in this ongoing scheme in or about January 2005, when MOC lured SHP into the enterprise's scheme by advising SHP to pursue a vastly more ambitious, expensive, and risky redevelopment of the Savoy Hotel that would double the available square footage.  Prior to its initial meeting with MOC and the principals that would later form CMA, the goal of SHP was to convert the Savoy Hotel

into condominium units for each of the original investors.  At the time, the Property had all the necessary legal approvals and commitments to implement this more modest conversion.

The more ambitious re-development plan called for sufficient funds, beyond acquisition financing, for SHP to take certain pre-construction steps, including, among other things: (1) clearing various title issues; (2) obtaining the required government approvals and development rights; and (3) securing requisite levels of condominium pre-sales.  MOC advised that these pre-construction steps would cost approximately $10 million, and recommended that SHP retain MOC's affiliate CMA to manage the property and its re-development, and further recommended that BankFirst and the Marshall Defendants be used to provide a $39 million pre-development loan that would pay off the recent financing and leave $10 million for the predevelopment.

In order to induce SHP to accept these recommendations, MOC, CMA, and BankFirst (through Ronald Sweet and Richard Burnton) misrepresented that BankFirst was a legitimate bank and that BankFirst and the Marshall Defendants would and could legally provide a $39 million loan irrespective of the financial condition of SHP, its investors, or the property, or documentation concerning such financial conditions. These misrepresentations were material to SHP because it emphasized repeatedly to MOC, CMA, and representatives of BankFirst and the Marshall Defendants that it could not contribute any further equity, nor provide financial documentation, such as tax returns.  For instance, in September of 2005, SHP's principal Abraham Werjuka met with Ronald Sweet and Richard Burnton, among others, to discuss the prospective loan.  At that time, Werjuka reiterated that it was not worthwhile to have further

discussions concerning a loan, unless Sweet and Burnton understood and agreed that SHP would not provide additional equity or financial documentation including tax returns. Sweet and Burnton assured Werjuka that they could nonetheless proceed with the loan, and indeed did proceed without the stated documentation or any meaningful due diligence.

BankFirst and the Marshall Defendants (through Ronald Sweet and Richard Burnton), as well as MOC and CMA, also misrepresented that the Savoy Loan would provide sufficient funds – not to mention flexibility in allocating such funds – for the estimated $10 million pre-development budget, when, in fact, they knew that, after they deducted their fees and interest upfront, SHP would be left with no more than $6 million, and that they would not be flexible in reallocating funds as necessary to accommodate the changing needs of the project. At the time, BankFirst and the Marshall Defendants understood that because of SHP's inability to fund financing from operations, invest additional capital or provide financial documentation to secure financing from other lenders, SHP would necessarily need to extend and/or refinance the Savoy Loan after a year, possibly with a new partner. To convince SHP to nevertheless proceed with the proposed plan and Savoy Loan, MOC, CMA, and BankFirst and the Marshall Defendants (through Ronald Sweet and Richard Burnton) represented to SHP that BankFirst would be ready, willing, and able to extend, refinance or restructure the Savoy Loan at the conclusion of its term so as to permit SHP to complete its redevelopment plan, and reallocate funds as necessary to accomplish pre-development goals. Based on these misrepresentations, SHP was induced to proceed with the proposed redevelopment plan using BankFirst financing.

However, at the time these representations were made they were materially false and misleading because, among other things:

- BankFirst was not a legitimate bank, as advertised, and instead was an instrument of the Marshall Defendants and Mathisen, among others, to secure more fees on the basis of its purported legitimacy and compliance with federal regulatory requirements;

- BankFirst was not legally permitted to provide the proposed financing without documenting and analyzing the financial condition of the property and borrower;

- SHP was not informed that in order to fund such financing BankFirst and the Marshall Defendants would need to manufacture false financial information about the property and borrower to mislead regulators and the Participants;

- SHP was not informed that because BankFirst was not permitted to provide such financing and, with the assistance of the Marshall Defendants,  would be preparing false financial and other information about the Property and borrower to mislead regulators and the Savoy Loan Participants, there was an enormous risk that BankFirst would never be willing or able to extend the term of, refinance, or modify the Savoy Loan or even cooperate in any effort to refinance or pay-off the Savoy Loan through other funding sources because to do so would risk exposing the illegal manner in which the Savoy Loan was originated and participated to regulators and breaches of representations and warranties it would make to the Participants in the Participation Agreements;

- SHP was not informed that the illegal loan scheme posed an enormous risk that banking regulators would initiate regulatory investigations and enforcement actions that would likewise substantially impair the ability of BankFirst to extend, refinance, or assist in any exit strategy other than foreclosure at the conclusion of the term of the Savoy Loan;

- SHP was not informed that any breach of the Participation Agreements would make BankFirst liable for any losses flowing from the Savoy Loan unless the Savoy Loan Participants remained unaware of those breaches; and

- SHP was not informed that the illegal loan scheme would breach representations and warranties that BankFirst would make to the Savoy

Loan Participants in their Participation Agreements, such that BankFirst and its owners Marshall BankFirst Corp. and Mathisen would not want to risk legal exposure by seeking the necessary approvals for extending and/or refinancing the Savoy Loan – leaving no exit strategy for avoiding liability to the Participants other than foreclosure.

Had these facts been truthfully represented, SHP would not have proceeded with this financing because it would have understood that the most likely outcome was a foreclosure on the Property, the loss of SHP's investment, as well as the value it would have otherwise been able to realize but for the enterprise's interference and fraud.

SHP was further harmed in February 2007 when BankFirst the Marshall Defendants and their representatives attempted to orchestrate circumstances to provide a basis for them to later deny that SHP validly extended the Savoy Loan according the terms of the Savoy Loan Agreement.  Thus, as the maturity date of the Savoy Loan approached, SHP made it clear that it intended to exercise the option to extend the maturity date of the Savoy Loan by six months so that it could continue its efforts to seek an appropriate partner to complete the development project.  Notwithstanding the fact that SHP properly extended pursuant to the Savoy Loan Agreement by providing written notice of its intention to extend on April 11, 2007, and Tanone's response indicating that once she would "begin the process of making any necessary amendments" to reflect BankFirst's agreement to modify the Savoy Loan and grant the extension, the Counter-Defendants now contend that the Savoy Loan could not be extended because SHP did not comply with the terms of a March 1, 2007 side letter.

In reality, the March 1st side-letter was a contrived means to either obtain the missing financial information that BankFirst the Marshall Defendants and their

employees desperately needed to make the Savoy Loan file "comply" during the

Federal Reserve's investigation, or to justify denying the extension and later foreclose

on the Savoy Loan.  Following SHP's proper exercise of the extension option,

BankFirst never made any representations that they could not, or might not be able to,

extend the Savoy Loan's maturity date as agreed, or ultimately refinance the Savoy

Loan.  Nor, did any representatives of BankFirst or the Marshall Defendants ever

acknowledge the ongoing Federal Reserve investigation and the impact that might have

on BankFirst's <u>ability</u> <u>to</u> extend, modify and/or refinance the Savoy Loan.  To the

contrary, BankFirst representatives acknowledged in writing that SHP had properly

exercised its extension option, and further enunciated, in writing, the documentation

and obligations BankFirst required as a result of SHP's extension.  Accordingly, SHP

believed that BankFirst would honor the extension thereby causing SHP to abandon

other exit alternatives.

SHP also was injured when, in May and June of 2007, Sweet held himself out as

the authoritative dealmaker for BankFirst and the Marshall Defendants.  As set forth

above, based on representations made by Sweet – concerning the fact that SHP need not

pay money to ensure a formal extension of the Savoy Loan and that BankFirst and its

work out group would likely accept an offer on certain specified terms – Hadar submitted

a term sheet vetted by Sweet.  Given the assurances provided by Sweet that the terms

would be acceptable – and that Participant approval would not be an obstacle – neither

SHP, nor Hadar sought any alternative exit.  For the same reason, SHP was also injured

when Sweet misrepresented to Werjuka that BankFirst would not foreclose as long as

discussions with new equity partners continued.

36

Finally, SHP was injured by BankFirst's initiation of this wrongful foreclosure action in June 2007, which significantly jeopardized the viability of the redevelopment project and, in doing so, has compromised the value of the Property, SHP's single asset. In fact, but for BankFirst's wrongful conduct and subsequent interference, the lucrative redevelopment project would by now be complete. By mid-June 2007, the redevelopment project, as reconfigured by SHP's new partner, Hadar, was not only realistic, but it had made considerable progress. SHP had obtained valuable, time-sensitive development rights based on approvals from the City of Miami Historic Preservation Board (the "HPB Approvals"), acquired the necessary zoning permissions, cleared outstanding title issues and secured approximately $30 million in pre-sale reservations. The approved redevelopment plan was designed to not only remedy existing structural and other deficiencies at the Savoy Hotel, but to exponentially increase the Property's value by doubling the improved square footage and replacing the current middle-market facility with a high-end luxury hotel. Given its pre-development progress, SHP had plenty of time remaining before the expiration of the HPB Approvals to submit its construction plans and secure the master building permits required to vest the HPB Approvals.

Yet, the fraudulent and illegal conduct carried out by the enterprise, which culminated with BankFirst's commencement of the instant foreclosure action on June 27, 2009, put an abrupt halt to the redevelopment project and resulted in the loss of the critical HPB Approvals necessary to make any renovations to the Property. The enterprise's conduct, including the foreclosure action has, among other things: (i) damaged the project's goodwill, resulting in the immediate cancellation of each and

every pre-sale reservation and preventing further pre-sale reservations; (ii) prevented SHP from securing building permits necessary to begin construction before the expiration of the HPB Approvals on June 28, 2009; (iii) prevented even the most modest repairs of the Savoy Hotel, decimating the value of the Property; and (iv) given rise to the commencement of multiple lawsuits against SHP by creditors associated with the redevelopment project.

Although the Savoy Hotel continues to operate, it is doing so at a significant financial deficit due to its badly outdated and deteriorated condition.  The Savoy Hotel is not generating positive cash flow, and an assessment by an engineering firm in March 2008 revealed that in order to continue operating as currently configured, the Savoy Hotel needs $27 million in structural and other repairs and renovations.  Without the necessary improvements to cure building code violations and address structural deficiencies and other necessary repairs, the Savoy Hotel is at risk of being shut down, which would render the Property essentially worthless.

While SHP was able to secure a one-time one-year extension of the very valuable HPB Approvals necessary to proceed with the redevelopment of the Property in June 2008, those approvals expired on June 28, 2009 because the on-going litigation prevented SHP from obtaining necessary building permits and commencing construction so as to vest those approvals.  Moreover, pursuant to a January 9, 2009 order from the City of Miami Board of Adjustment, two zoning variances associated with the property likewise expired on June 28, 2009 for the same reason.

Even with the completion of the repairs and renovations necessary to continue operating in its current size and configuration, a March 2008 appraisal valued the

Property at no more than $28-29 million – which is well below the loan amount. Accordingly, the last known appraised value of the Property (as of the March 2008 appraisal) in its current size, configuration, and condition was approximately $1.5-2 million.

The Property also currently enjoys certain other valuable "grandfathered" zoning rights and permits that otherwise will lapse in the event the Savoy Hotel is closed.  To the extent that Hotel is closed as a result of the continued financial strain placed on it by the foreclosure action, those grandfathered rights will be lost as well.

Eric Hadar:  Based on the representations made by Ronald Sweet that an offer provided by Eric Hadar to refinance the Savoy Loan would be accepted, on June 18, 2007, Eric Hadar invested $1,000,000.00 in SHP.  Eric Hadar believed that an administrative snafu had caused the bank to wrongfully file foreclosure papers, and believed an amicable resolution was imminent.  Accordingly, on August 16, 2007, Eric Hadar entered into an agreement with Werjuka and Savoy Hotel Partners wherein he obligated himself and entities owned by him to manage the Property and fund the Savoy Hotel's operating shortfall.  Since that time, Hadar has expended significant additional monies to fund the Property's operating shortfall, to attempt to extend or otherwise salvage the critical HPB Approvals and other zoning rights, and to defend against this wrongful foreclosure action.

The Savoy Loan Participants:  The Savoy Loan Participants that entered into Participation Agreements to purchase portions of the A Note and/or B Note and held such

notes to maturity are also victims of the fraudulent scheme.[9]  In violation of sound banking practices and, in some respects, BankFirst's own loan policies, those charged with underwriting the credit failed to perform remotely adequate due diligence with respect to the value of the collateral, the entitlements associated with the Property, and the integrity of the guarantee, among other things.  In addition, BankFirst and the Marshall Defendants, as well as their representatives, failed to obtain critical financial documents, such as the guarantor's tax returns, as required under the Savoy Loan Documents.  Notwithstanding their admitted failure to perform even minimum due diligence, the Counter-Defendants' originators (including Sweet and his team) prepared a Confidential Information Memorandum ("CIM") outlining supposedly vetted details concerning the transaction, including information about the borrowers and guarantors for each loan.  Upon completion of the CIM, The Marshall Group's sales team transmitted the CIMs, along with the inflated "third party" appraisal for the property, to prospective participant banks.

Participants in the Savoy Loan were injured when they relied on the CIM in their credit decision making process.[10]  Because the Savoy CIM contained a host of misrepresentations about the guarantor's financial strength and net worth, and the permanence of the development rights and other entitlements associated with the Property, among other things, the Participants were fraudulently induced to purchase debt

---

[9]   It should be noted that certain Savoy Loan Participants who merely warehoused portions of the Savoy Loan temporarily, and sold back their portions of the Savoy Loan prior to the foreclosure (these portions were ultimately sold to the Wisconsin banks who still hold the Savoy Loan to date), did not lose their investments.

[10]   Thirty seven banks agreed to participate in Savoy Loan, entered into Participation Agreements with BankFirst to purchase debt in either the A Note or B Note between May 12, 2006 and February 6, 2007.

in the Savoy Loan.  Because the value of the collateral is nowhere near the dollar amount

of the Savoy Loan, in the best case scenario, the Participants in the A Note will collect

cents on each dollar they invested.  Participants in the B Note, which is subordinated to

the A Note, will likely collect nothing.

Moreover, Participants were also harmed by Hayes' and Fischer's

misrepresentations in June of 2007, that the borrower and the guarantor in the Savoy

Loan were "unwilling[] to provide any alternatives or repay the loan in full."  The

Participants were similarly harmed when representative of BankFirst failed to alert them

about the dozens of other others inquiries and offers concerning the Savoy Loan, because

BankFirst had a policy of immediately rejecting all such offers.   Had the Participants

known about the other offers, including the Hadar offer, they may have chosen an

alternative to foreclosure.  Pursuing the foreclosure action has harmed the Participants

because they are required by the Participation Agreements to fund all attorneys fees for

pursuing the foreclosure.

> The Borrowers and Participants in Other BankFirst and
> Marshall Defendant Loans, Including the Other South Florida Loans:

Borrowers and participants in numerous loans around the country and in South

Florida have been injured in much the same was as SHP and the Participants in the Savoy

Loan.[11]  The scheme described herein resulted in the origination of hundreds of millions

---

[11]   In the state court action, SHP sought RICO discovery concerning other loans
originated in or around the same time as the Savoy Loan with one or more of the same
participants that are also in default or otherwise past due.  Counsel for BankFirst, now
counsel for the FDIC, objected on the basis that the requests would require BankFirst to
turn over the lions' share of its loan files.  On May 28, 2009 the General Magistrate
Elizabeth Schwabedissen issued a Report and Recommendation (the "May 28th R&R")
ordering BankFirst to produce the files for its loans in the South Florida market.  Before

of dollars of loans almost all of which are non-performing (as set forth above two-thirds of the loan's on BankFirst's book, which do not account for all of the loans originated during the pendency of the scheme, were ninety days past due at the time the FDIC was appointed as a receiver).  Indeed, as of 2009, the Marshall Defendants and BankFirst had pared their staff down to the bare bones, with a handful of analysts retained to "manage" the credit.  As of May 2009, eighty percent of the credits for which analyst Tanone was responsible were in default.  The same was true for two-thirds of Joel Fischer's credits. Because nearly all of the loans originated by BankFirst were "pre-development" loans, borrowers were fraudulently induced to pay exorbitant fees and borrow too much money secured by too little collateral by a Bank that held itself out as legitimate, but was nothing more than a mechanism for the Enterprise to generate more fee income without regard to the actual outcome of the loans.  Similarly, the participants in those loans, small community banks throughout the country, were fraudulently induced to purchase debt in loans that were not properly underwritten or collateralized, and accordingly have lost the majority of their investment and have been forced to carry these non performing assets on their books during a period of heightened federal scrutiny about the soundness of their balance sheet.  In the interim, such participants are contractually obligated to subsidize any action the Marshall Defendants or BankFirst felt was necessary to "protect the collateral".

BankFirst Depositors/ the FDIC:  On July 17, 2009 BankFirst was seized by federal regulators for severe undercapitalization stemming from construction and development losses in an amount upwards of $95 million since the beginning of 2008.

BankFirst was taken over by the FDIC, BankFirst filed exceptions to the May 28th R&R, which were fully briefed and pending at the time the action was removed to this Court.

Published reports suggest that BankFirst's failure is likely to cost the FDIC's deposit

insurance fund an estimated $91 million.

**5.      Describe in detail the pattern of racketeering/criminal activity or collection of an unlawful debt for each RICO claim.  A description of the pattern of racketeering/criminal activity shall:**

**a.      Separately list the predicate acts/incidents of criminal activity and specific statutes violated by each predicate act/incident of criminal activity;**

**b.      Separately state the dates of the predicate acts/incidents of criminal activity, the participants and a description of the facts surrounding each predicate act/incident of criminal activity;**

**c.      If the RICO claim is based on the predicate offenses of wire fraud, mail fraud, fraud in the sale of securities, fraud in connection with  a case un USC title 11 or fraud  as defined under Chapter 817, Fla. Stat., the "circumstances constituting the fraud or mistake shall be stated with particularity", Fed.R.Civ.P. 9(b) (identify the time, place, and contents of the misrepresentation or omissions, and the identity of persons to whim and by whom the misrepresentations or omissions were made);**

**d.      State whether there has been a criminal conviction for any of the predicate acts/incidents of criminal activity;**

**e.      Describe in detail the perceived relationship that the predicate acts/incidents of criminal activity bear to each other or to some external organizing principle that renders them "ordered" or "arranged" or "part of a common plan"; and**

**f.      Explain how the predicate acts/incidents of criminal activity amount to or post a threat of continued criminal activity.**

**ANSWER to 5(a):**  The activities engaged in by the Counter-Defendants in

furtherance of the fraudulent schemes alleged in the Counterclaims include violations of

each of at least 4 criminal statutes incorporated into the definition of "criminal activity"

in Fla. Stat. Ann. § 772.102.

<u>Wire Fraud</u>

18 U.S.C. § 1343 is violated by any person who "having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses" transmits or causes to be transmitted by means of "wire . . . communication in interstate or foreign commerce any writings . . . or sounds" for the purpose of "executing such scheme or artifice . . . ."  As detailed in response to 5(c) below, violations of this provision occurred throughout the course of the scheme from 1999 when Mathisen first purchased the investment bank Miller & Schroeder and renamed it The Marshall Group through at least July 17, 2009 when the FDIC closed BankFirst, Mathisen's chosen instrument to continue the scheme.

During the period from 1999 through 2005, in furtherance of the scheme of mortgage fraud, The Marshall Group regularly used the wires to disseminate false and fraudulent information to borrowers, participants and potential participants, and regulators in pre-development and other loans it originated.  Beginning in 2005, the Counter-Defendants and Enterprise Members routinely invoked BankFirst  to fraudulently misrepresent to both borrowers and participants that they were operating a legitimate bank governed by and in compliance with regulatory guidelines, and misrepresented such compliance to regulators when in fact the bank was purchased in the first place with the specific intent to use its name to create that precise misapprehension while at no time complying with such guidelines or applicable law.  During this entire period, the Counter-Defendants and the Enterprise Members used the wires to communicate and/or transmit inflated and fraudulent appraisals to borrowers and participants and potential participants and make other misrepresentations and also used the wires regularly to process and service the fraudulent loans.  In the final stages of the

Savoy Loan, the Counter-Defendants and Enterprise Members used the wires to cover-up the result of the Federal Reserve's investigation into BankFirst's lending practices so that they could create circumstances in which they could convince the participants to pursue foreclosure.

SHP and the participants in the Savoy Loan, as well as the borrowers and participants in the other South Florida Loans, including the Key West and Hollywood transactions and other loans, including the Le Nature's Loan were recipients of all of the above-mentioned wire communications to transmit intentionally false and misleading information. A more specific list of instances of mail fraud herein – with dates and participants – is included as part of the response to subdivisions 5(b)- (c).

Mail Fraud

18 U.S.C. § 1341 is violated by any person who "having devised or intending to devise any scheme or artifice to defraud" sends or receives "any matter or thing whatever" through "the postal service" or any "private or commercial interstate carrier" for the purpose of "executing such scheme or artifice or attempting to do so . . . ." As detailed in response to 5(c) below, violations of this provision occurred throughout the course of the scheme from 1999 when Mathisen first purchased the investment bank Miller & Schroeder and renamed it The Marshall Group through at least July 17, 2009 when the FDIC closed BankFirst, Mathisen's chosen instrument to continue the scheme.

During the period from 1999 through 2005, in furtherance of the scheme of mortgage fraud, The Marshall Group used the mails to disseminate false and fraudulent prospectuses to borrowers, participants and potential participants, and regulators in pre-development and other loans it originated. Beginning in 2005, the Counter-Defendants

and the Enterprise Members routinely used materials in the name of BankFirst and Marshall BankFirst Corp. to fraudulently misrepresent to both borrowers and participants that they were operating as a legitimate bank governed by and in compliance with regulatory guidelines, when in fact they purchased the bank in the first place with the specific intent to use its name to create that precise misapprehension while at no time complying with such guidelines or applicable law.  During this entire period, the Counter-Defendants and the other Enterprise Members used the mails to transmit inflated and fraudulent appraisals to borrowers and participants and potential participants.  In the final stages of the Savoy Loan, the Counter-Defendants and the other Enterprise Members used the mail to cover-up the result of the Federal Reserve's investigation into BankFirst's lending practices so that they could create circumstances in which they could justify pursuing foreclosure.

SHP and the participants in the Savoy Loan, as well as the borrowers and participants in the other South Florida Loans, including the Key West and Hollywood transactions, and other loans, including the Le Nature's Loan, were recipients of all of the above-mentioned types of mailings including intentionally false and misleading information.  A more specific list of instances of mail fraud herein – with dates and participants – is included as part of the response to subdivisions 5(b)- (c).

<u>Usury</u>

Fla. Stat. Ann. § 867.071 is violated when payment on a loan is at a "greater rate of interest than is allowed by law."  Here, including the loan and origination fees charged by BankFirst, SHP was charged an interest rate exceeding the legal lending rate on the portion of the Savoy Loan that was not fully participated to other lenders.

<u>Fraud as defined in Chapter 817, Fla. Sta.</u>

Fla. Stat. § 817.034(4)(b) is the state law analog to the federal mail and wire fraud statutes.  Having demonstrated federal mail and wire fraud violations, SHP has also demonstrated violations of § 817.034(4)(b).  Such violations are predicate acts under Florida RICO.  In particular, it is a violation of § 817.034(4)(a) sufficient to form a Florida RICO predicate for a salesperson to, using the mail or wires, "misrepresent the[] suitability or . . . character, or both" of certain investments in high risk securities and charge highly elevated prices for the same.  Here, SHP alleges that the Bank and the other Enterprise Members induced SHP and the borrowers in the South Florida Loans, including the Hollywood and Key West Transactions (Counterclaims ¶¶ 43, 45) to enter into unsuitable loans by misrepresenting, among other things, that the loans were legal, did not provide the necessary financing to accomplish the pre-development goals, were based on grossly inflated or inaccurate appraisals, and that the Bank was issuing these loans without regard to likely success of the projects they financed because they did not intend to maintain the risk of loss themselves (<u>id.</u> ¶¶ 43, 45, 50-54, 57-60).  The Counter-Defendants and other wrongdoers received exorbitant fees and later initiated foreclosure on the Property on the basis of the unsuitable Loan.  (<u>Id.</u>)

**ANSWER to 5(b)-(c):**  As discussed in more detailed below, the Counterclaim contains two counts alleging violations of § 772.102(1)-(4).  Count One relates to (i) Counter-Defendants' use of proceeds from racketeering activity to acquire an interest in the Property, the property at issue in the other South Florida Loans, including the Hollywood and Key West Transactions and other loans, as well as its interests in BankFirst and other enterprises, (ii) Counter-Defendant's acquisition and maintenance of

their ownership interest in the Savoy Hotel, the property at issue in the other South Florida Loans, including the Hollywood and Key West Transactions and other loans, as well as its interests in BankFirst  and other enterprises and (iii) Counter-Defendant's participation in a broad range of fraudulent schemes designed to fraudulently induce borrowers and lenders to do purportedly legitimate business with them, so that they could garner enormous fees.  Count Two charges the Counter-Defendants with participation in a conspiracy alleged in connection with the conduct described in Count One.

<u>**COUNT I: VIOLATIONS OF FLA. STAT. § 772.103(1)-(3)**</u>

Through the conduct and the acts and omissions set forth in the Counterclaims and summarized herein, the Counter-Defendants and other Enterprise Members in conjunction with other Enterprise Members, knowingly and intentionally used the proceeds from criminal activity to acquire their ownership interest in the Savoy Hotel , the property at issue in the other South Florida Loans, including the Hollywood and Key West Transactions and other loans, including the Le Nature's Loan, as well as its interest in BankFirst and other enterprises, and to acquire and maintain their ownership interest in the Savoy Hotel, the property at issue in the other South Florida Loans, including the Hollywood and Key West Transactions and other loans, as well as its interests in BankFirst and other enterprises.  Moreover, the Counter-Defendants and other Enterprise Members participated in a broad range of fraudulent schemes designed to induce borrowers and lenders to do purportedly legitimate business with them, so that Counter-Defendants and the other Enterprise Members could garner enormous fees.

The transactions at issue were induced by the Counter-Defendants and other Enterprise Members by fraudulent misrepresentations and omissions directed to the borrowers <u>and</u> those community banks around the country that actually funded the loans.  Counter-Defendants and the other Enterprise Members stood in the middle generating fees for themselves, which they used in furtherance of their scheme.  In each case, the Counter-Defendants, first through The Marshall Group and later through BankFirst, took an interest in the collateral securing each loan as the servicers of the participations, maintaining control of the loans after origination while passing off the risk to the participants that funded the loans.  The Counter-Defendants adopted a strategy whereby at all times they kept the borrowers and participants from each other, ensuring they or other Enterprise Members were the only ones able to provide "information" about the loans and/or the borrower to the participants.  In fact, participants were contractually forbidden from contacting borrowers.  The Counter-Defendants and other Enterprise Members filled the void with misinformation and material omissions in order to generate more fees for themselves.

The Counter-Defendants and other Enterprise Members lead borrowers to believe that Counter-Defendants' pawn, BankFirst, was a legitimate bank that would provide a legitimate loan.  Many of the borrowers had difficult to finance projects with questionable collateral – <u>e.g.</u>, bottling equipment, a dock, plots of land outside of major metropolitan or highly desirable  areas or a crumbling hotel burdened by historic status and other zoning restrictions.  In many instances, and certainly in the case of SHP, the borrowers did not even believe that financing would be available based on the collateral and the financial condition of the entity and potential guarantor.  In many

instances, and certainly in the case of SHP, the borrowers never intended to seek financing for their project.  However,  Counter-Defendants developed a network of brokers and appraisers skilled at identifying such marginal projects and coaxing the owner to consider a loan with BankFirst to pursue a grand development plan with the help of inflated appraisals.

The Savoy Loan was originated in 2006, the latter part of this scheme, which dates back to at least 1999.  In 2005, Counter-Defendants and other Enterprise Members working at their direction used inflated appraisals by Hornstein, commissioned in March and August 2005 to convince SHP's principals to purse a pre-development loan with BankFirst.  On or about September 7 or 8, 2005, SHP's principals met with Sweet, Burnton and representatives of CMA to discuss the potential for the Savoy Loan.  At that time, SHP's principal clearly disclosed that he would not and could not proceed with a loan in the event he would need to provide any documentation, particularly in support of any personal guarantee.  Sweet and Burnton agreed, expressing their interest in not only the pre-development loan, but partnering in the ultimate development of the Property, including by being flexible concerning distribution of pre-development funds and extension of the initial loan.  Understanding this limitation, representatives of the Counter-Defendants repeatedly contacted SHP using the mails and wires to induce SHP to enter into the Loan without ever disclosing that it would only be able to provide such financing by typically making material misrepresentations and omissions to the participating banks that would fund the loan, such that Counter-Defendants could never live up to their representations to SHP.

In or about March 2006, having dragged out closing until such time as it was too late for SHP to seek viable alternatives, Counter-Defendants suddenly changed the terms of the Savoy Loan to include additional fees, interest and escrow requirements not before discussed or agreed to, amounting to interest in excess of the legal lending rate on the portion of the Savoy Loan Counter-Defendants ultimately retained.  During this period, Counter-Defendants internally concluded that the Savoy Loan was extremely high risk carrying the significant possibility of foreclosure and loss.  It pressed ahead to sell out the debt, without achieving 100% success.  The Savoy Loan nonetheless closed, because BankFirst proceeded by evading its lending limit through illegal warehouse arrangements with short-term participants for the excess debt.

By the time the Savoy Loan was approaching maturity, the fraudulent loan scheme had already resulted in federal and state regulators descending upon the Counter-Defendants, especially BankFirst, forcing them to stop underwriting, participating, and servicing loans through BankFirst.  Obviously concerned about the massive legal exposure associated with their unraveling scheme, for over eight months the Counter-Defendants and other Enterprise Members concealed from certain employees, as well as SHP, other borrowers, and participating banks the aggressive regulatory intervention caused by their fraudulent conduct and their resulting inability to continue doing business.  As a result, at the time the Savoy Loan reached maturity, those BankFirst employees dealing with SHP repeatedly represented that they were prepared to extend the Savoy Loan, provide the construction financing that was originally anticipated when the Savoy Loan was issued, and forebear from any foreclosure.  Based on these representations, SHP elected not to pursue other exit

alternatives, and, in fact, validly extended the Savoy Loan for six months in accordance with its terms.

Notwithstanding the representations made to SHP, senior executives at the Counter-Defendants who were aware of their inability to underwrite, participate, or service loans further (in particular the Savoy Loan) intervened and, without any notice to SHP – and contrary to their representations –  sought permission from the Participant Banks to commence this foreclosure action.  In doing so, they misrepresented the status of the Savoy Loan and the various alternatives to foreclosure, such as extending the loan, they and SHP had discussed.  Based on these misrepresentations, the Participant Banks were falsely induced into approving foreclosure, which the Counter-Defendants immediately commenced. The objective was to conceal from the Participant Banks who had been fraudulently induced into investing into the Savoy Loan the fact that regulatory intervention into this fraudulent scheme had essentially shutdown the Counter-Defendants' ability to pursue other alternatives, and, instead, again mislead the Participant Banks into believing that the real problem was the borrower.  This move had the further benefit of shifting the costs of dealing with the Savoy Loan entirely to the Participants Banks, who were obligated under their Participation Agreements to pay legal fees and costs associated with a foreclosure action.

In furtherance of their wide-ranging scheme, Counter-Defendants and other Enterprise Members knowingly and intentionally used the mails in United States or foreign commerce to commit fraud in violation of 18 U.S.C. § 1341, which is incorporated as "criminal activity" under the Florida RICO statute pursuant to Fla. Stat.

§ 772.102(1)(b), directly injuring SHP and the borrowers in the other South Florida
Loans including the Key West and Hollywood Transactions and other loans.

In furtherance of their wide-ranging scheme, Counter-Defendants and other
Enterprise Members knowingly and intentionally used the wires in United States or
foreign commerce to commit a fraud in violation of 18 U.S.C. § 1343, which is
incorporated as "criminal activity" under the Florida RICO statute pursuant to Fla. Stat.
§ 772.102(1)(b), directly injuring SHP and the borrowers in the other South Florida
Loans including the Key West and Hollywood Transactions and other loans.

In furtherance of their wide-ranging scheme, Counter-Defendants and other
Enterprise Members committed and aided and abetted fraudulent practices and fraud
generally in violation of Chapter 817 of the Florida Statutes including, but not limited
to, by aiding and abetting a scheme to defraud in violation of Fla. Stat. § 817.034,
which is incorporated as "criminal activity" under the Florida Civil Remedies for
Criminal Practices Act ("Florida RICO") pursuant to Fla. Stat. § 772.102(1)(a)(22),
directly injuring SHP and the borrowers in the other South Florida Loans including the
Key West and Hollywood Transactions and other loans.

In furtherance of their wide-ranging scheme, Counter-Defendants and other
Enterprise Members committed and aided and abetted usurious practices in violation of
Chapter 687 of the Florida Statutes which is incorporated as "criminal activity" under
the Florida Civil Remedies for Criminal Practices Act ("Florida RICO") pursuant to
Fla. Stat. § 772.102(1)(a)(11), directly injuring SHP and the borrowers in the other
South Florida Loans including the Key West and Hollywood Transactions and other
loans.

It was the purpose of the Counter-Defendants and other Enterprise Members to perpetuate a fraudulent mortgage lending scheme for their own enrichment.  The Enterprise orchestrated by the Counter-Defendants achieved these objectives by engaging in criminal activity, including, among other things:

- Using the mail and wires to engage in an egregious and wide-spread scheme of fraudulent and predatory mortgage and other lending practices, including the origination and participation of the Savoy Loan at issue here, South Florida Loans and other loans;

- Using the mail and wires to perpetrate the false and fraudulent perception that BankFirst was a legitimate bank, including through the maintenance of a website www.marshallbankfirst.com;

- Disseminating fabricated due diligence materials and materially false and misleading prospectuses, marketing and other materials to mislead borrowers, banking regulators and the participating banks to which they participated such loans;

- Providing fraudulent due diligence materials, prospectuses and other materials to the participating banks to which they participated such loans falsely in certain instances depicting such loans as thoroughly researched and conservative;

- Using the mail and wires to attempt to misappropriate property;

- Securing control over monies and opportunities that they then appropriated, through use of the mail and wires, for their own benefit;

- Using the mail and wires to originate commercial real estate loans irrespective of the borrower's financial condition, or the underlying property or business value, therefore, neglecting their obligation to verify such information;

- Using the mail and wires to originate commercial real estate by obtaining false, inaccurate or inflated appraisals;

- Using the mail and wires to fraudulently induce SHP to pursue an ambitious redevelopment plan by materially: (a) misrepresenting that BankFirst could provide necessary financing irrespective of the financial condition of the property, SHP, or SHP's investors; (b) failing to disclose that the Savoy Loan would violate federal and state banking laws, regulations and standards, as well as the representations and warranties the Bank made in the participation agreements it

entered into with participating banks; (c) failing to disclose that the Savoy Loan would also require dissemination of materially false and misleading financial information, prospectuses and other materials as part of its syndication to participating banks; (d) failing to disclose that these misrepresentations and omitted facts rendered it highly unlikely that BankFirst would or could, as it promised and contractually obligated itself to do, agree to extend, restructure, and/or refinance the Savoy Loan at maturity to permit SHP to complete its redevelopment plan; (e) failing to disclose that BankFirst intended to use foreclosure as the exit strategy for the Savoy Loan;

- Using the mail and wires to misrepresent to SHP that it could legally obtain the Savoy Loan without contributing any further equity, or providing financial documentation, such as tax returns, frequently required to secure such pre-development financing;

- Using the mail and wires to misrepresent to SHP that it could, would and did extend the Loan, when, in fact, it could not extend or refinance without the approval of the Participants;

- Using the mail and wires to misrepresent to SHP that it could, would and did extend the Savoy Loan when, in fact, it could not extend or refinance without the approval of the Participants, which it would not seek out of concern that it would otherwise expose its breaches of representations and warranties in the Participation Agreements;

- Using the mail and wires to misrepresent to SHP through Hadar, acting on his own behalf and as an agent of SHP, that it could and would refinance the Savoy Loan with him at par value when, in fact, it could not refinance without the approval of the Participants, which it would not seek out of concern that it would otherwise expose its breaches of representations and warranties in the participation agreements and indeed did not seek instead using the mails and wires to wrongfully inform the Participants that the borrower and guarantor were "unwilling[] to provide any alternatives or repay the loan in full";

- Using the mail and wires to misrepresent to SHP through Hadar, acting on his own behalf and as an agent of SHP, that it was unnecessary to execute an agreement specifically forestalling foreclosure while he negotiated with the Bank to refinance the Savoy Loan at par value because the Bank intended to move ahead with refinancing and would not foreclose;

- Using the mail and wires to misrepresent to the borrowers in the Hollywood Loan that it would: (a) provide construction financing if the borrowers first accepted a high interest rate, short-term teaser loan; (b) provide or, alternatively, assist in finding alternative construction financing if the borrowers paid fees and other consideration to extend the high interest rate, short-term teaser loan on multiple occasions over a two-year period; (c) be flexible in allocating money for pre-

development if the borrowers accepted the high interest rate, short-term teaser loan; (d) allocate all of the funds designated for pre-development under the high interest rate, short-term teaser loan;

- Using the mail and wires to make material misrepresentations and omissions to participants in other loans, including the Key West Loan wherein the participants in the B Note ousted BankFirst for its dishonesty and nearly initiated suit and the Le Natures Loan wherein certain participants did bring suit against the Counter-Defendants herein for fraudulent concealment, negligent misrepresentation and breach of contract.

Beginning at least as early as 1999, and continuing through at least July 15, 2009 when BankFirst was taken over by an FDIC receiver, and in furtherance of and for the purpose of executing and attempting to execute the described schemes and artifices to defraud, Counter-Defendants and other Enterprise Members, on numerous occasions, used and caused to be used wire communications in interstate and foreign commerce and the U.S. mails, by both making and causing to be made wire communications and mailings.  These wire communications and mailings were made, inter alia, for the purposes of communicating with Enterprise Members, borrowers and participants in the Savoy Loan, the other South Florida Loans including the Key West and Hollywood Transactions and other loans including the Le Natures Loan to effectuate the fraudulent mortgage lending scheme and wiring monies in furtherance of the same.  These wire communications caused direct injuring SHP and the borrowers in the other South Florida Loans including the Key West and Hollywood Transactions and other loans.

Each such use of a wire communication and/or mailing in connection with the described schemes and artifices to defraud constitutes a separate and distinct violation, by virtue of violating the incorporated federal predicate acts proscribed by 18 U.S.C. §§ 1341 and/or 1343, as well as Fla. Stat. § 817.034.  Counter-Defendants and other

Enterprise Members used the wires and mails to perpetrate their fraudulent mortgage lending scheme causing direct injury to direct injuring SHP and the borrowers in the other South Florida Loans including the Key West and Hollywood Transactions and other loans.  While SHP does not have full knowledge of the extent of the use of the wires and mails by Counter-Defendants and other Enterprise Members in furtherance of the scheme, the chart that follows shows some, but not all, of those violations.

Counter-Defendants and their representatives communicated in furtherance of the fraudulent scheme, by electronic mail and U.S. mail to other Enterprise Members. Moreover, Counter-Defendants and various Enterprise Members also used electronic mail and U.S. mail, and spoke on the phone regularly to conduct the activities of the Enterprise.  The total number of phone calls, e-mails and mailings and the identities of all Enterprise Members is not yet known, but the Counter-Defendants and other Enterprise Members engaged in the following phone calls, e-mails, and U.S. mailings as set forth in the table below, each constituting a separate mail or wire communication in furtherance of the fraudulent scheme:

| MAIL AND WIRE COMMUNICATIONS | | | | |
|---|---|---|---|---|
| **Sender/Caller** | **Recipient** | **Date** | **Subject** | **Method** |
| Counter-Defendants | All visitors | All material times between 2005-July 17, 2009 | Relationship between Marshall Defendants and regulated Bank | www.marshallbankfirt.com/ internet |
| Wiley H. Sharp, III,  Todd Kennedy and Terrie Ferrise (The Marshall Group) | MB Financial Bank, N.A. | Between 12/04-1/05 | Direct Solicitation of the LeNature's Loan | Email |

| MAIL AND WIRE COMMUNICATIONS | | | | |
|---|---|---|---|---|
| **Sender/Caller** | **Recipient** | **Date** | **Subject** | **Method** |
| Wiley H. Sharp, III,  Todd Kennedy and Terrie Ferrise (The Marshall Group) | MB Financial Bank, N.A. | Between 12/04-1/05 | Direct Solicitation of the LeNature's Loan | Telephone |
| Wiley H. Sharp, III,  Todd Kennedy and Terrie Ferrise (The Marshall Group) | MB Financial Bank, N.A. | Between 12/04-1/05 | Direct Solicitation of the LeNature's Loan | Facsimile |
| Wiley H. Sharp, III,  Todd Kennedy and Terrie Ferrise (The Marshall Group) | MB Financial Bank, N.A. | On or after 1/10/05 | Transmission of the LeNature's CIM | Email and Facsimile |
| Wiley H. Sharp, III,  Todd Kennedy and Terrie Ferrise (The Marshall Group) | MB Financial Bank, N.A. | On or after 1/10/05 | Value of the Bottling Equipment | Conference Calls |
| Gary Cohen | Ronald Sweet | 2/21/05 | New Deal - Savoy | Email |
| Gary Cohen | Ronald Sweet | 3/10/05 | Avi's Financials | Email |
| Gary Cohen | Ronald Sweet | 3/11/05 | Savoy.PDF – Summary of Appraisal | Email |
| Frank Hornstein | Gary Cohen | 8/5/05 | Savoy | Email |
| Frank Hornstein | Gary Cohen | 8/6/05 | Savoy | Email |
| Frank Hornstein | Gary Cohen | 8/15/05 | Savoy | Email |
| Gary Cohen | Ronald Sweet | 8/16/05 | Executive Loan Summary | Email |

| MAIL AND WIRE COMMUNICATIONS | | | | |
|---|---|---|---|---|
| **Sender/Caller** | **Recipient** | **Date** | **Subject** | **Method** |
| Frank Hornstein | Gary Cohen | 8/22/05 | Savoy & Torino | Email |
| Ronald Sweet | Gary Cohen | 9/6/05 | Proposed Financing Terms | Email |
| Ronald Sweet | Gary Cohen | 9/6/05 | Proposed Financing Terms | Facsimile |
| Gary Cohen | Ronald Sweet | 11/3/05 | Acceptance of Term Sheet | Email |
| Ronald Sweet | Gary Cohen | 11/15/05 | Revised Term Sheet | Email |
| Richard Burnton | Amber Shimp Ronald Sweet Holly Grigsby | 11/21/05 | Savoy RAC – leveraging up the property | Email |
| Ronald Sweet | Gary Cohen | 12/12/05 | Revised Term Sheet | Email |
| Counter-Defendants | American Bank of the North | Between 12/1/05-2/28/06 | CIM | Email and U.S. Mail |
| Counter-Defendants | American Trust and Savings Bank | Between 12/1/05-2/28/06 | CIM | Email and U.S. Mail |
| Counter-Defendants | Badger State Bank | Between 12/1/05-2/28/06 | CIM | Email and U.S. Mail |
| Counter-Defendants | Citizens State Bank of Lankin | Between 12/1/05-2/28/06 | CIM | Email and U.S. Mail |
| Counter-Defendants | Dakota Western Bank | Between 12/1/05-2/28/06 | CIM | Email and U.S. Mail |
| Counter-Defendants | Exchange State Bank | Between 12/1/05-2/28/06 | CIM | Email and U.S. Mail |
| Counter-Defendants | Fairwinds Credit Union | Between 12/1/05-2/28/06 | CIM | Email and U.S. Mail |

| MAIL AND WIRE COMMUNICATIONS | | | | |
|---|---|---|---|---|
| **Sender/Caller** | **Recipient** | **Date** | **Subject** | **Method** |
| Counter-Defendants | Family Merchants Bank | Between 12/1/05-2/28/06 | CIM | Email and U.S. Mail |
| Counter-Defendants | Farmers & Merchants Bank & Trust | Between 12/1/05-2/28/06 | CIM | Email and U.S. Mail |
| Counter-Defendants | Farmers and Merchants Bank | Between 12/1/05-2/28/06 | CIM | Email and U.S. Mail |
| Counter-Defendants | Farmers & Merchants State Bank of Pierz | Between 12/1/05-2/28/06 | CIM | Email and U.S. Mail |
| Counter-Defendants | Fidelity National Bank | Between 12/1/05-2/28/06 | CIM | Email and U.S. Mail |
| Counter-Defendants | First American State Bank of Minnesota | Between 12/1/05-2/28/06 | CIM | Email and U.S. Mail |
| Counter-Defendants | First National Bank & Trust Company in Larned | Between 12/1/05-2/28/06 | CIM | Email and U.S. Mail |
| Counter-Defendants | First State Bank of Wabasha | Between 12/1/05-2/28/06 | CIM | Email and U.S. Mail |
| Counter-Defendants | Forreston State Bank | Between 12/1/05-2/28/06 | CIM | Email and U.S. Mail |
| Counter-Defendants | Fort Madison Bank & Trust | Between 12/1/05-2/28/06 | CIM | Email and U.S. Mail |
| Counter-Defendants | Green Lake State Bank | On or about 1/1/07 | CIM | Email and U.S. Mail |
| Counter-Defendants | Highland Community Bank | Between 12/1/05-2/28/06 | CIM | Email and U.S. Mail |

| MAIL AND WIRE COMMUNICATIONS | | | | |
|---|---|---|---|---|
| **Sender/Caller** | **Recipient** | **Date** | **Subject** | **Method** |
| Counter-Defendants | Iowa Savings Bank | Between 12/1/05-2/28/06 | CIM | Email and U.S. Mail |
| Counter-Defendants | Midwest Bank | Between 12/1/05-2/28/06 | CIM | Email and U.S. Mail |
| Counter-Defendants | Midwest Financial Services, Inc. | Between 12/1/05-2/28/06 | CIM | Email and U.S. Mail |
| Counter-Defendants | Northwestern Bank | Between 12/1/05-2/28/06 | CIM | Email and U.S. Mail |
| Counter-Defendants | Ohio Heritage Bank | Between 12/1/05-2/28/06 | CIM | Email and U.S. Mail |
| Counter-Defendants | Rosemount National Bank | Between 12/1/05-2/28/06 | CIM | Email and U.S. Mail |
| Counter-Defendants | Royal Savings Bank | Between 12/1/05-2/28/06 | CIM | Email and U.S. Mail |
| Counter-Defendants | Savanna-Thomson State Bank | Between 12/1/05-2/28/06 | CIM | Email and U.S. Mail |
| Counter-Defendants | Security State Bank | Between 12/1/05-2/28/06 | CIM | Email and U.S. Mail |
| Counter-Defendants | St. Ansgar State Bank | Between 12/1/05-2/28/06 | CIM | Email and U.S. Mail |
| Counter-Defendants | State Bank of Delano | Between 12/1/05-2/28/06 | CIM | Email and U.S. Mail |
| Counter-Defendants | State Bank of Texas | Between 12/1/05-2/28/06 | CIM | Email and U.S. Mail |

| MAIL AND WIRE COMMUNICATIONS | | | | |
|---|---|---|---|---|
| **Sender/Caller** | **Recipient** | **Date** | **Subject** | **Method** |
| Counter-Defendants | State Bank & Trust Company and State Bank of Waverly | Between 12/1/05-2/28/06 | CIM | Email and U.S. Mail |
| Counter-Defendants | Stearns Bank National Association | Between 12/1/05-2/28/06 | CIM | Email and U.S. Mail |
| Counter-Defendants | The Baraboo National Bank | On or about 1/1/07 | CIM | Email and U.S. Mail |
| Counter-Defendants | The Peoples State Bank | Between 12/1/05-2/28/06 | CIM | Email and U.S. Mail |
| Counter-Defendants | The State Bank of Viroqua | On or about 1/1/07 | CIM | Email and U.S. Mail |
| Counter-Defendants | Monroe County Court | 12/12/05 | Assignment of Leases and Rents | Email/U.S. Mail/Facsimile |
| Counter-Defendants | Monroe County Court | 12/12/05 | Mortgage, Assignment of Rents and Leases, Security Agreement and Fixture Filing | Email/U.S. Mail/Facsimile |
| Counter-Defendants | Monroe County Court | 12/12/05 | Warranty Deed | Email/U.S. Mail/Facsimile |
| Ronald Sweet | Gary Cohen | 12/13/05 | Revised Term Sheet | Email |
| Ronald Sweet | Gary Cohen | 12/13/05 | Revised Term Sheet | Facsimile |
| Richard Burnton | Sales Team Scott Anderson Ronald Sweet Amber Shimpa Paul Ekholm Jim Clifford Meghan Harris Richard Pitts | 1/04/06 | Savoy Site Visit | Email |
| Ronald Sweet | Gary Cohen | 1/12/06 | Revised Term Sheet | Email |
| Ronald Sweet | Gary Cohen | 2/15/06 | Revised Term Sheet | Email |

| MAIL AND WIRE COMMUNICATIONS | | | | |
|---|---|---|---|---|
| **Sender/Caller** | **Recipient** | **Date** | **Subject** | **Method** |
| Matthew Morrell | Martha Matos | 2/16/06 | Exec. Summ. Savoy | Email |
| Ronald Sweet | All Loan Participants | 3/6/06 | $39.5 First Mortgage Loan Savoy Hotel Partners, LLC, Miami Beach Florida | Loan Link |
| Ronald Sweet | Gary Cohen | 3/7/2006 | Revised Term Sheet | Email |
| Tom Grady | Sales Team Jim Clifford Scott Anderson Richard Burnton | 3/10/06 | Follow-up Sales Meeting | Email |
| Paul Ekholm | Amber Shimpa Richard Pitts Ronald Sweet Richard Burnton Lynette Nelson Jenny Fitzer | 3/13/06 | The Savoy CIM | Email |
| Counter-Defendants | Broward County Court | 3/28/06 | Mortgage, Assignment of Rents and Leases, Security Agreement and Fixture Filing | Email/U.S. Mail/Facsimile |
| Counter-Defendants | Broward County Court | 3/28/06 | Assignment of Leases and Rents | Email/U.S. Mail/Facsimile |
| Counter-Defendants | Broward County Court | 3/28/06 | UCC Statement | Email/U.S. Mail/Facsimile |
| Ronald Sweet | Gary Cohen | 4/4/2006 | Revised Term Sheet | Email |
| Gina Price | Matthew Morrell | 4/20/06 | Savoy Update | Email |
| Paul Ekholm | Ronald Sweet Richard Burnton Melanie Tanone | 5/10/06 | Savoy | Email |

| MAIL AND WIRE COMMUNICATIONS | | | | |
|---|---|---|---|---|
| **Sender/Caller** | **Recipient** | **Date** | **Subject** | **Method** |
| Gary Cohen | Ronald Sweet | 5/31/06 | Savoy | Email |
| Melanie Tanone | Gary Cohen Todd Brown Ronald Sweet | 6/5/06 | Savoy | Email |
| Mary Ann Orfei | Jim Clifford | 6/6/06 | Savoy Hotel B Note | Email |
| Gina Price | Sales Team Jim Clifford Scott Anderson Richard Burnton Ronald Sweet | 6/10/06 | Savoy Update – Warehousing | Email |
| Gary Cohen | Ronald Sweet | 7/7/06 | Letter re: Werjuka's Trust balances | Email |
| Ronald Sweet | Hank Rodstein | 7/10/06 | FW: Letter re: Werjuka's Trust balances | Email |
| Hank Rodstein | Ronald Sweet, Lazaro Solano | 7/10/06 | FW: FW: Letter re: Werjuka's Trust balances | Email |
| Counter-Defendants | Broward County Court | 8/10/06 | Amendment To Promissory Note | Email/U.S. Mail/Facsimile |
| Terri Ferrise | Ronald Sweet Melanie Tanone | 8/29/06 | Savoy | Email |
| Melanie Tanone | Milton Robinson | 10/17/06 | Construction Loan | Email |
| Melanie Tanone | Milton Robinson Gary Cohen Ronald Sweet Richard Pitts | 12/15/06 | Savoy | Email |
| Gary Cohen | Melanie Tanone | 12/15/06 | Savoy Reallocation Request | Email |
| Perry Levin | Melanie Tanone | 12/20/06 | Italian Pension fund completing due diligence on Savoy | Email |

| MAIL AND WIRE COMMUNICATIONS | | | | |
|---|---|---|---|---|
| **Sender/Caller** | **Recipient** | **Date** | **Subject** | **Method** |
| Terri Ferrise | Melanie Tanone | 12/21/06 | Construction Loan | Email |
| Gary Cohen | Abraham Werjuka | 1/23/07 | Savoy Loan | Email |
| Perry Levin | Ronald Sweet | 1/25/07 | Meeting with Fabrizio | Email |
| Todd Brown | Gary Cohen | 1/29/07 | Financial Reporting | Email |
| Perry Levin | Ronald Sweet | 02/07/07 | Savoy Loan | Email |
| Perry Levin | Ronald Sweet Melanie Tanone | 02/08/07 | Savoy Update | Email |
| Perry Levin | Abraham Werjuka Gene Grabarnick Ronald Sweet | 2/09/07 | The Savoy | Email |
| Perry Levin | Ronald Sweet | 2/12/07 | Savoy | Email |
| Perry Levin | Ronald Sweet Melanie Tanone | 2/22/07 | Savoy | Email |
| Melanie Tanone | Milton Robinson | 2/23/07 | Savoy | Email |
| Melanie Tanone | Gary Cohen | On or about 3/1/07 | Attaching Side Letter | Email |
| Perry Levin | Ronald Sweet Melanie Tanone | 3/14/07 | Update | Email |
| Richard Burnton | Melanie Tanone | 3/16/07 | Existing Loan Issues – Savoy | Email |
| Melanie Tanone | Melanie Tanone | 3/21/07 | Update – Perry Transactions | Email |
| Melanie Tanone | Gary Cohen, Milton Robinson, Ronald Sweet, Richard Pitts | 4/6/07 | Savoy Loan - Maturity & Extension Option | Email |

| MAIL AND WIRE COMMUNICATIONS | | | | |
|---|---|---|---|---|
| **Sender/Caller** | **Recipient** | **Date** | **Subject** | **Method** |
| Melanie Tanone | Gary Cohen, Milton Robinson, Ronald Sweet, Richard Pitts | 4/10/07 | Savoy Loan - Maturity & Extension Option | Email |
| Perry Levin | Ronald Sweet | 04/10/07 | Savoy Update | Email |
| Gary Cohen | Ronald Sweet | 4/11/07 | Savoy Loan - Maturity & Extension Option | U.S. Mail |
| Melanie Tanone | Gary Cohen, Milton Robinson, Ronald Sweet, Richard Pitts | 4/12/07 | Savoy Loan - Maturity & Extension Option | Email |
| Melanie Tanone | Gerald Anderson Richard Burnton Ronald Sweet Richard Pitts | 4/16/07 | Savoy Loan - Maturity & Extension Option | Email |
| Melanie Tanone | Gary Cohen, Milton Robinson, Ronald Sweet, Richard Pitts, Lee Bialostok | 4/26/07 | Savoy Loan - Maturity & Extension Option | Email |
| Melanie Tanone | Gary Cohen, Milton Robinson, Ronald Sweet, Richard Pitts, Lee Bialostok | 4/27/07 | Savoy Loan - Maturity & Extension Option | Email |

| MAIL AND WIRE COMMUNICATIONS | | | | |
|---|---|---|---|---|
| **Sender/Caller** | **Recipient** | **Date** | **Subject** | **Method** |
| Melanie Tanone | Gary Cohen, Milton Robinson, Ronald Sweet, Richard Pitts, Lee Bialostok | 4/30/07 | Savoy Loan - Maturity & Extension Option | Email |
| Perry Levin | Gene Grabarnick Remo Polselli Marta Logusz | 4/30/07 | Savoy | Email |
| Perry Levin | Ronald Sweet | 4/30/07 | Savoy | Email |
| Abraham Werjuka | Ronald Sweet | 5/07 | Extension | Telephone call |
| Melanie Tanone | Gary Cohen Milton Robinson Ronald Sweet | 5/01/07 | Savoy Loan - Maturity & Extension Option | Email |
| Perry Levin | Ronald Sweet | 5/01/07 | Savoy | Telephone call |
| Perry Levin | Ronald Sweet | 5/08/07 | Savoy | Email |
| Melanie Tanone | Hemal Gundecha | 5/09/07 | Savoy Loan - Maturity & Extension Option | Email |
| Joel Fischer Ronald Sweet | All Participants | 5/10/07 | Savoy Hotel & Residences & Savoy Beach Club | Loan Link |
| Melanie Tanone | Gary Cohen, Milton Robinson, | 5/15/07 | Savoy Loan - Maturity & Extension Option | Email |
| Melanie Tanone | Eric Hadar, Ronald Sweet | 5/21/07 | Savoy Summary & Crystal Bay Tahoe Mezzanine | Email |
| Joel Fischer | Gary Cohen and Ronald Sweet | 5/22/07 | Default Letter | Email |

| MAIL AND WIRE COMMUNICATIONS | | | | |
|---|---|---|---|---|
| **Sender/Caller** | **Recipient** | **Date** | **Subject** | **Method** |
| Melanie Tanone | Eric Hadar, Ronald Sweet | 5/29/07 | Follow-up re Savoy Summary & Crystal Bay Tahoe Mezzanine | Email |
| Gary Cohen | Joel Fischer, | 6/1/07 | Responding to request for documents to support new appraisal | Email |
| Joel Fischer | Gary Cohen, Abraham Werjuka, Michael Hayes Scott Anderson | 6/6/07 | Savoy Hotel Partner, LLC loan with BankFirst | Email |
| Ronald Sweet, James Lund, Hayes | Eric Hadar | 6/7/07 | Hadar Term Sheet | Conference Call |
| Ronald Sweet | Michael Hayes, James Clifford | 6/8/07 | Hadar Term Sheet | Email |
| Ronald Sweet | Eric Hadar | 5/07-6/8/07 | Proposed Offer | Phone Calls |
| Joel Fischer Michael Hayes | Merlin Zitzner | 6/8/07 | Correspondence re Savoy Loan enclosing Foreclosure Response Form | Loan Link (email) |
| James Lund | Eric Hadar | 6/11/07 | Refinancing Savoy Loan | Phone Call |
| Perry Levin | Ronald Sweet | 6/19/07 | Savoy  Update | Email |
| Perry Levin | Ronald Sweet | 6/22/07 | Purchase of Savoy note at par | Email |
| Perry Levin | Ronald Sweet | 6/22/07 | Savoy Loan Purchase Update | Email |
| Joel Fischer | Gary Cohen, Abraham Werjuka, Mark Wolfson and James Lund | 6/27/07 | Notice of Additional Default | Email |
| Perry Levin | Melanie Tanone | 6/28/07 | Purchase of Savoy note at par | Email |

| MAIL AND WIRE COMMUNICATIONS | | | | |
|---|---|---|---|---|
| Sender/Caller | Recipient | Date | Subject | Method |
| Perry Levin | Ronald Sweet | 6/30/07 | Meetings Next Week | Email |
| Perry Levin | Ronald Sweet | 7/21/07 | Country Inn & Suites | Email |
| Perry Levin | Melanie Tanone | 8/25/07 | Savoy in NY Times Sat – Send to Ron | Email |
| BankFirst | Broward County Court | 8/27/07 | Amendment To Promissory Note | Email/U.S. Mail/Facsimile |
| Counter-Defendants | Broward County Court | 9/28/07 | Amendment To Promissory Note | Email/U.S. Mail/Facsimile |
| Counter-Defendants | Broward County Court | 11/20/07 | Amendment To Promissory Note | Email/U.S. Mail/Facsimile |

## COUNT II: VIOLATION OF FLA. STAT. § 772.103(4)

Beginning at least as early as 1999, and continuing through at least July 15, 2009 when BankFirst was taken over by an FDIC receiver Counter-Defendants and the other Enterprise Members knowingly agreed to facilitate the scheme described herein to conduct and participate in the conduct of the affairs of the Enterprise and conspired to do so within the meaning of Fla. Stat. § 772.102(3) through a pattern of criminal activity within the meaning of Fla. Stat. § 772.102(4).

Counter-Defendants and the other Enterprise Members, were persons intimately involved in transactions carried on by and the affairs of the Enterprise unlawfully and willfully combined, conspired, confederated, and agreed with each other to violate Fla. Stat. § 772.103(1)-(3), all in violation of Fla. Stat. § 772.103(4).

Part of the conspiracy was that Counter-Defendants and the other Enterprise Members committed or agreed to commit two or more fraudulent and illegal criminal

acts and conducted and agreed to conduct the affairs of the Enterprise through the

pattern of criminal activity in violation of Fla. Stat. § 772.103(1)-(3) described above.

In furtherance of the conspiracy and to effect the objects thereof, Counter-

Defendants and the other Enterprise Members committed and caused to be committed a

series of overt acts, including, but not limited to:

- Finding victims for the scheme, by marketing BankFirst as an institution that legitimately could and would originate loans irrespective of the borrower's financial condition or the underlying property or business value;

- Actively assisting in luring SHP and other borrowers into the scheme by advising SHP and other borrowers to pursue vastly more ambitious, expensive, and risky redevelopments than initially planned or to take out wildy inappropriate loans for speculative and unjustified developments;

- Inducing SHP to accept the ambitious redevelopment recommendations by misrepresenting that BankFirst would and could legally provide a $39 million loan irrespective of the financial condition of SHP, its investors or the property;

- Preparing false, inaccurate or inflated appraisals for the Savoy Loan, as well as the Key West Loan and the Hollywood Loan, among others;

- Misrepresenting that the Loan to SHP, as well as the Key West Loan, the Hollywood Loan and other South Florida Loans, would provide sufficient pre-development funds for the estimated development budget;

- Misrepresenting to the borrowers in the Hollywood Loan that the Bank would be flexible in allocating money for pre-development if the borrowers accepted the high interest rate, short-term teaser loan and that it would allocate all of the funds designated for pre-development under the high interest rate, short-term teaser loan;

- Working in concert to manufacture false financial, appraisals and other information about the Property and SHP;

- Actively assisting in materially: (a) misrepresenting that BankFirst could provide necessary financing irrespective of the financial condition of the property, SHP, or SHP's investors; (b) failing to disclose that the Savoy Loan would violate federal and state banking laws, regulations and standards; and (c) failing to disclose that the Savoy Loan would also require dissemination of materially false and misleading financial information,

prospectuses and other materials as part of its syndication to participating banks;

- Conspiring to misrepresent to SHP that it could legally obtain the Savoy Loan without contributing any further equity, or providing financial documentation, such as tax returns, frequently required to secure such pre-development financing;

- Actively assisting in luring other borrowers, including the borrowers in the Key West Loan, the Hollywood Loan and other South Florida Loans as well as loans originated in other regions into the scheme by advising them to pursue risky development plans; and

- Inducing the borrowers in the Hollywood Loan to accept a high interest rate, short-term, teaser loan under the guise that it would later provide construction, or other financing or assist in procuring the same.

**ANSWER to 5(d):**  There has been no criminal conviction for any of the incidents of criminal activity.  On January 13, 2009, however, the state court denied Counter-Defendants' motion to dismiss the Counterclaim.

**ANSWER to 5(e):**  The criminal activity alleged in the Counterclaim and summarized in response to subparts 5(a) –(c) herein was all part of a systematic and wide-ranging scheme of credit and commercial mortgage related fraud consisting of repeated and continuous acts that had the same or similar intents, results, accomplices, victims or methods of commission or that otherwise are interrelated by distinguishing characteristics and are not isolated incidents.  Each of the predicate acts alleged advances one or more of the essential elements of the scheme.  Among other things, the Counter-Defendants co-opted and corrupted a state-chartered and FDIC insured bank, BankFirst, and then used the mails and wires to misrepresent its fundamental capabilities to borrower and potential participants, leading them to believe it was a "legitimate" bank because it was a "regulated bank", when in fact they did not follow

and relevant regulations, laws or safe lending practices.  In addition, the Counter-Defendants regularly fabricated due diligence materials and prepared materially false and misleading prospectuses, appraisals, marketing and other materials and disseminated them through the mails and wires to mislead banking regulator and the banks to which it participated the debt.   In executing this sophisticated and highly organized scheme, which the Counter-Defendants perpetrated throughout the country, they worked closely with corrupted brokers, appraisers and in some cases purported agents of the borrowers.   All of this was designed to accomplish the common end of inducing borrowers to take out loans and participants to buy debt in those loans – even if they were wildly speculative and destined to fail – so that Counter-Defendants and Enterprise Members could charge and earn exorbitant and/or usurious fees, virtually without risk.

     **ANSWER to 5(f):** Although BankFirst is now in federal receivership, the other Marshall Defendants are not.  Prior to purchasing BankFirst to lend the Enterprise the air of legitimacy, Mathisen used The Marshall Group and other entities to perpetrate the same fraud.  Then in January of 2007, the Counter-Defendants and other Enterprise Members, purposefully moved their loan origination operations back to The Marshall Group from BankFirst to avoid further federal scrutiny and to allow them to continue their efforts to originate loans without regard to federal regulations and applicable law.  Moreover, to the extent that a souring real estate market has prevented the Counter-Defendants from generating a large number of new originations, the Counter-Defendants and several other Enterprise Members are now seeking to exploit the declining real estate market to make fees at the expense of the victims of their scheme a

second time by bundling non-performing loans and selling them at distressed prices.

For all of these reasons, there is no basis to believe that the Enterprise's fraudulent

activities will cease in the near future.


6.      **Describe in detail the enterprise for each RICO claim.  A description of the enterprise shall:**

      a.      **State the names of the individuals, partnerships, corporations, associations or other entities constituting the enterprise.**

      b.      **Describe the structure, purpose, roles, function, and course of conduct of the enterprise;**

      c.      **State whether any defendants are employees, officers, or directors of the enterprise;**

      d.      **State whether any defendants are associated with the enterprise, and if so how;**

      e.      **Explain how each separate defendant participated in the direction or conduct of the affairs of the enterprise;**

      f.      **State whether you allege (i) that the defendants are individuals or entities separate from the enterprise, or (ii) that the defendants are the enterprise itself or (iii) that the defendants are members of the enterprise; and**

      g.      **If you allege any defendants to be the enterprise itself, or members of the enterprise, explain whether such defendants are perpetrators, passive instruments, or victims of the racketeering activity.**

      **ANSWER to 6(a):**  The enterprise for each RICO claim alleged in the

Counterclaims is the same.  The enterprise is comprised of the following individuals and

entities: BankFirst; Marshall BankFirst Corp.; The Marshall Group; Marshall Financial

Group, LLC; Dennis Mathisen; Scott Anderson; Michael Hayes; Ronald Sweet; Melanie

Tanone; James Lund; Joel Fisher; Richard Burnton; Frank Hornstein; CMA Development

Group, LLC; MOC Capital Partners, Inc.; HR Mortgage and Realty; Henry Rodstein

(deceased); and others unknown to SHP at this time.  Further discovery in this matter

may reveal additional members of the enterprise unknown to SHP at this time or greater

involvement and control in the enterprise by those already known to SHP.

The individuals and entities set forth above formed an organization through an

association in fact with the common purpose of defrauding SHP and other borrowers, as

well as participating banks, for the purpose of enriching themselves, and these individuals

and entities functioned as a continuing unit throughout the course of the scheme set forth

in the Counterclaims.  The fraud perpetrated against SHP is part of a larger scheme in

which the enterprise operated to defraud numerous borrowers and participant banks as

part of a regular way of doing business.

**ANSWER to 6(b):**  The structure, purpose, roles, function, and course of conduct

of the enterprise is described in the Counterclaims and in response to Questions 2 and 3

above.

In summary, the enterprise functioned as a continuing unit with an ascertainable

structure separate and distinct from the pattern of criminal activity in which it engaged.

The enterprise acted with the common purpose of affecting an unlawful scheme to enrich

its members with enormous fee and interest income at the expense of SHP, other

borrowers, participant banks, as well as the other victims set forth above in response to

Question 4.

As alleged in the Counterclaims, each member of the enterprise and those

associated with the enterprise played a distinct role in furthering the overall goal of the

enterprise.  For example, CMA, MOC, Henry Rodstein and HR Mortgage and Realty

served as corrupted brokers, recruiting and later securing unsuspecting borrowers to

transact business with BankFirst.  As part of this effort, these corrupted brokers worked

hand in hand with loan originators, including Ronald Sweet, BankFirst's top producer, who specialized in ocean front properties across the entire southeast region of the United States. Once the borrowers were secured, CMA, and later Marshall BankFirst Corp., commissioned Frank Hornstein and other appraisers, directing them to generate inflated, inaccurate appraisals of the collateral in order to persuade borrowers to consider loftier development plans requiring larger loans (thus generating larger fee and interest income for the Counter-Defendants) and to persuade participant banks to purchase pieces of these purportedly well-secured loans.

Once the collateral was evaluated, BankFirst and the Marshall Defendants each had a role in originating, marketing and servicing the Savoy Loan and other fraudulently induced loans. As set forth in more detail in response to Question 2, BankFirst and the Marshall Defendants directed the efforts to originate the loans and then marketed pieces of the loans to unsuspecting participant banks who were under the false impression that the Counter-Defendants had properly vetted the borrowers and collateral in accordance with state and federal banking regulations. As set forth in more detail in response to Question 3, the enterprise members employed by the Counter-Defendants who were involved in these efforts included Scott Anderson, Richard Burnton, Ronald Sweet, Melanie Tanone, Michael Hayes and Joel Fischer.

Dennis Mathisen, for his part, was responsible for instigating the fraudulent scheme, using his ownership interest in and position as the Chairman of The Marshall Group and Marshall BankFirst Corp. to purchase BankFirst in January 2005 for the purpose of providing the legitimacy necessary to advance the scheme. The Counter-

Defendants also played an indirect role in creating legitimacy, enabling the enterprise to continue attracting more business and generating additional fees.

Scott Anderson, in addition to his role originating and marketing the loans, was a principal actor in covering up the fraudulent scheme, as well as the discovery and investigation of that scheme by state and federal regulators. Not only did Anderson not advise borrowers and participants of the restrictions imposed on BankFirst and the Marshall Defendants by the Federal Reserve as early as January 2007 – which severely limited the Counter-Defendant's ability to conduct business – , but, he also knew and approved of the Counter-Defendant's sale of a $10.2 million piece of the A Note to three participant banks after Marshall BankFirst Corp.'s Board of Directors voted to cease the Counter-Defendants' loan participation business. Moreover, when the news of the Federal Reserve's investigation and draconian restrictions became public in August 2007, Anderson misled participant banks about the scope and underlying rationale for the restrictions. Anderson was also instrumental in the Counter-Defendants' efforts to circumvent the restrictions imposed by the Federal Reserve, moving the loan origination group lead by Richard Burnton out of BankFirst and into The Marshall Group, a non-banking entity not subject to regulation by the Federal Reserve.

In the spring of 2007, the Counter-Defendants also implemented stricter standards for documenting already-originated loans in an effort to cover-up the fraudulent scheme. Specifically, the Counter-Defendants directed enterprise members Melanie Tanone and Joel Fischer to use the ruse of a loan extension to paper the Savoy Loan file, in an effort to conceal its deficiencies from the Federal Reserve. Tanone and Fischer were also directed to change the terms of the extension option, which was validly exercised by

SHP.  Fischer, Michael Hayes and James Lund were also involved in defrauding the participant banks by misrepresenting SHP's willingness and ability to negotiate an alternative to foreclosure, failing to disclose to the Savoy Loan Participant Banks dozens of inquiries and offers throughout the spring and summer of 2007 from third parties interested in refinancing or purchasing outright the Savoy Loan.

ANSWER to 6(c):  None of the Counter-Defendants currently named in the Counterclaims –BankFirst, Marshall BankFirst Corp., The Marshall Group, and Marshall Financial Group LLC – are employees, officers, or directors of the enterprise.  The specific nature of each Counter-Defendants' relationship with the enterprise, as identified in subpart (a) above, is set forth in the responses to Questions 2, 3 and 6(b).

ANSWER to 6(d)-(f):  Counter-Defendants BankFirst, Marshall BankFirst Corp., The Marshall Group, and Marshall Financial Group LLC are all "associated with" the enterprise.  Not only are the Counter-Defendants members of the enterprise, but they knowingly participated in, and orchestrated, the enterprise's fraudulent scheme.  Working with and directing other members of the enterprise, the Counter-Defendants engaged in criminal activity that harmed SHP.  The specific details of each Counter-Defendants' association with the enterprise, as well as an explanation of how each Counter-Defendant participated in the direction or conduct of the enterprise's affairs, is set forth in the responses to Questions 2, 3 and 6(b).

ANSWER to 6(g):  Counter-Defendants BankFirst, Marshall BankFirst Corp., The Marshall Group, and Marshall Financial Group LLC are all perpetrators of the criminal activity that harmed SHP.  As set forth in response to Question 2 above, the Counter-Defendants orchestrated a wide-ranging scheme of mortgage and other lending

fraud, directing the affairs of an enterprise comprised of more than one dozen individuals

and entities.

**7.     State whether you allege, and describe in detail, how the pattern of racketeering/criminal activity and the enterprise are separate or have they merged into one entity.**

ANSWER to 7:  The enterprise alleged in the Counterclaims is comprised of

individuals and legal entities engaged in business or banking activities separate and apart

from the criminal activity committed by its members and for its benefit.  Although the

fraud engaged in by the Counter-Defendants and other Enterprise Members was

pervasive and materially affected the affairs of the enterprise, it did not occur to the

complete exclusion of other business activity conducted by the members of the

enterprise.

**8.     Describe the relationship between the activities and the pattern of racketeering/criminal activity.  Discuss how the racketeering/criminal activity differs from the usual and daily activities of the enterprise, if at all.**

ANSWER to 8:  The criminal activity alleged in the Counterclaims – the

enterprise's systemic and wide-ranging scheme of mortgage-related fraud – differs from

the usual and daily activities of the various Enterprise Members.  Many of the Enterprise

Members identified in the Counterclaims are banking, financial, or related institutions

which in the ordinary course carry on certain legitimate business in addition to the

criminal activity alleged.  For instance, Marshall BankFirst, Corp. is a bank holding

company that exists to own banks and does own at least one bank other than BankFirst,

that holds deposits for depositors and otherwise functions as a typical bank.  Indeed, the

additional bank owned by Marshall BankFirst, Corp. was not taken over by the F.D.I.C.

Even BankFirst itself operated legitimate business unrelated to its mortgage fraud.  For

instance, it also had depositors and worked to provide innovative ways to make workers compensation payments at lower costs.  The same is true for the other individual Enterprise Members.  For instance, MOC, Hank Rodstein and HR Mortgage & Realty, brokered legitimate loans as well, but in the course of their work also identified appropriate targets for the enterprise's scheme of mortgage fraud – borrowers with questionable collateral and/or easily manipulated into outlandish or improbable development plans.

In light of the foregoing, there is a distinction between the daily activities of the individual Enterprise Members and their role in the pattern of criminal activity alleged. There is no distinction, however, between the pattern of criminal activity and the daily activities of the enterprise, i.e. the Enterprise Members together as they are associated in fact for the purpose of committing mortgage fraud to earn fees at little or no risk.

**9.     Describe what benefits, if any, the enterprise and each defendant received from the pattern of racketeering/criminal activity.**

**ANSWER to 9:**  The Counter-Defendants and other members of the enterprise received significant economic benefits from their respective roles in the criminal activity and overall fraudulent scheme.

For example, the Counter-Defendants and their executives secured lucrative fees and interest from originating, participating, and managing the fraudulently-obtained loans while holding virtually none of the risk associated with such loans.  In addition to the fee and interest income deposited on the balance sheets of BankFirst and the Marshall Defendants, their executives and loan originators earned bonuses and commissions based on a percentage of the fees that they individually generated for the bank over the course of each fiscal year.  These commissions and bonuses were paid irrespective of whether

the loans became nonperforming, giving executive and originators an incentive to close as many loans as possible, regardless of the credit worthiness of those loans.  According to Richard Burnton, there was no claw back if the loans turned out to be non-performing.

The corrupted brokers and real estate developers CMA, MOC, Henry Rodstein and HR Mortgage and Realty, earned fees from the Counter-Defendants commensurate with their services, generating higher fees each time they recruited and secured unsuspecting borrowers, luring them into the fraudulent scheme.  CMA, for its part, also earned lucrative fees from SHP, convincing Werjuka (who was based overseas) to allow them to oversea the development of the Property, all the while serving as a double agent for BankFirst.

Frank Hornstein, the only corrupted appraiser known to involved in the enterprise at this time, also had a economic incentive to participate in the fraudulent scheme, generating inflated appraisals at the request of the Counter-Defendants.  So long as Hornstein delivered the numbers that the Counter-Defendants wanted and needed to justify the substantial loans they were convincing borrowers to pursue, the Counter-Defendants would continue to bring business his way, generating lucrative fees for him and his company AppraisalFirst, Inc.  In less than a two year period, South Florida-based Hornstein was commissioned to perform five appraisals of the Savoy Hotel Property – just one of the many South Florida Loans caught up in the web of the Counter-Defendants' criminal scheme.

Moreover, the very existence of the enterprise, and the legitimacy with which it operated, allowed the Counter-Defendants and the enterprise as a whole to mask its

pattern of criminal activity, making it easier for the enterprise to continue receiving

economic benefits through its unlawful and fraudulent activities.

**10.     Describe the effect of the enterprise's activities on interstate or foreign commerce.**

     **ANSWER to 10:**  Fla. Stat. § 772.103 does not require that the enterprise's

activities have an effect on interstate commerce.

**11.     If the complaint alleges a violation of 18 U.S.C. § 1962(a) or § 772.103(1), Fla. Stat., provide the following information:**

     **a.     Describe the amount of income/proceeds derived, directly or indirectly, from a pattern of racketeering/criminal activity, or through the collection of an unlawful debt;**

     **b.     State who received the income/proceeds derived from the pattern of racketeering/criminal activity or through the collection of an unlawful debt and the date of that receipt;**

     **c.     Describe how and when such income/proceeds were invested or used in the acquisition of the establishment or operation of the enterprise;**

     **d.     Describe how you were directly injured by the investment or use; and**

     **e.     State whether the same entity is both the liable "person" and the "enterprise" under the § 1962(a)/§ 772.103(1) claim.**

     **ANSWER to 11(a)-(d):**  Without the benefit of further discovery, especially the

long sought-after discovery related to SHP's RICO claims that the Counter-Defendants

have consistently refused to disclose, the exact amount of the proceeds derived from the

Counter-Defendants' and Enterprise Members' pattern of criminal activity, and the dates

of receipt of such proceeds, is difficult to ascertain.

     Notwithstanding this fact, as stated more fully in the response to Questions 4, 9

and most specifically in the discussion of Count One in response to Question 5 above,

proceeds, in the form of enormous fees and interest, were derived from the pattern of

criminal activity at the expense of SHP, other borrowers, participant banks, as well as the other enumerated victims.  In order to maximize their ill-gotten gains, the Counter-Defendants co-opted a state-chartered and FDIC insured bank, BankFirst, to misrepresent its fundamental capabilities to borrower and potential participants.  In addition, the Counter-Defendants regularly fabricated due diligence materials, and prepared and distributed materially false and misleading prospectuses, appraisals, marketing and other materials to mislead borrowers, banking regulators and the banks to which it participated out the debt.  In executing this scheme, Counter-Defendants worked closely with corrupted brokers, appraisers and in some cases purported agents of the borrowers.  All of this was designed to accomplish the common end of inducing borrowers to take out loans and participants to buy debt in those loans – even if they were wildly speculative and destined to fail – so that the Counter-Defendants and other Enterprise Members could charge and earn exorbitant and/or usurious fees, virtually without risk.

While the exact amount of proceeds derived from the enterprise's fraudulent scheme remains unknown at this time, it is likely upwards of tens of millions of dollars, if not in excess of one hundred million dollars.  Discovery has revealed that Ronald Sweet, the originator for the Savoy Loan, generated roughly $4-5 million in annual fees for BankFirst and the Marshall Defendants.  Sweet, however, was but <u>one</u> originator underwriting loans in <u>one</u> region of the country.  Discovery has also revealed that BankFirst held and serviced at least 73 commercial real estate loans all over the country, each with dozens of participants paying fees for the privilege of doing business with the Counter-Defendants.  To add some context, the Savoy Loan, on its own, had 37

participants, each paying the standard participation fee charged by BankFirst in the amount of 0.25% of the loan participation amount per annum.

In addition to participation fees, the Counter-Defendants collected exorbitant fee and interest income from its borrowers, even on participated loans.  On the Savoy Loan specifically, the total amount in fees and interest unlawfully charged by BankFirst was $1,749,500.00, which, based upon the amount of the loan, amounts to a usurious interest rate of 37.9 percent.  Of this amount, $98,278.43 consisted of "interest" and $1,651,228.20 consisted of "fees" charged by BankFirst.

The proceeds and income of the enterprise were used to continue the enterprise's operations by, among other things, compensating members of the enterprise with bonuses and commissions based on a percentage of the fees that they generated for BankFirst over the course of the bank's fiscal year irrespective of whether the loan became nonperforming, giving the Enterprise Members an incentive to close as many loans and generate as many fees as possible, regardless of the credit worthiness of those loans.  Proceeds were further used to compensate corrupted brokers to recruit and secure unsuspecting borrowers to transact business with BankFirst, and to compensate Enterprise Member appraisers, to generate inflated, inaccurate appraisals of the collateral.

**ANSWER to 11(e):**  Each of the "persons" charged with a violation of Fla. Stat. § 772.103(1) in the Counterclaims is distinct from the "enterprise" whose affairs they are charged with conducting or participating in the conduct of.

**12.    If the complaint alleges a violation of 18 U.S.C. § 1962(b) or § 772.103(2), Fla. Stat., provide the following information:**

**a.    Describe in detail the acquisition or maintenance of any interest in or control of the enterprise;**

**b.** Describe when the acquisition or maintenance of an interest in or control of the enterprise occurred;

**c.** Describe how you were directly injured by this acquisition or maintenance of an interest in or control of the enterprise; and

**d.** State whether the same entity if both the liable "person" and the "enterprise" under the § 1962(b)/§ 772.103(2) claim.

**ANSWER to 12(a)–(c):** As set forth more fully in the answers to Questions 5 and 6 above, the Counter-Defendants' fraudulent scheme originated in 1999 when Enterprise Member Dennis Mathisen first purchased the investment bank Miller & Schroeder and renamed it The Marshall Group. Enterprise Members Mathisen and The Marshall Group maintained the fraudulent scheme by purchasing BankFirst in January 2005 for the purpose of providing the purported legitimacy necessary to advance the scheme. Indeed, beginning in 2005, in order to maximize its income, Counter-Defendants co-opted a state-chartered and FDIC insured bank, BankFirst, to misrepresent its fundamental capabilities to borrowers and potential participants that they were operating a legitimate bank governed by and in compliance with applicable banking law and regulations. In fact, the opposite was true. BankFirst was purchased to create the perception that its loans were legitimate and complied with regulations to attract new borrowers and participants, but the loans were actually enormously risky transactions that did not comply with law or regulation. The expanded borrower and participant targets allowed the enterprise to originate more loans, and earn more risk free fees.

SHP was directly injured by the acquisition of BankFirst and the enterprise's continued maintenance of its scheme to defraud. SHP believed it was entering into a genuine lending relationship with a legitimate banking institution willing to finance a pre-development and construction project that SHP initially did not believe was available

84

based on its financial condition, its available collateral and the financial condition of its guarantor.  However, the enterprise, through the use of BankFirst and other Enterprise Members including brokers and appraisers skilled at identifying marginal projects such as SHP's, induced SHP to consider a loan with BankFirst to pursue a grand development plan.

The Savoy Loan was originated in 2006.  By the time the Savoy Loan was approaching maturity, the fraudulent loan scheme had already resulted in federal and state regulators descending upon the Counter-Defendants, especially BankFirst, forcing them to stop underwriting, participating, and servicing loans through BankFirst.  However, Counter-Defendants and other Enterprise Members failed to advise SHP of the regulatory intervention caused by the Enterprise's fraudulent conduct and BankFirst's resulting inability to continue doing business.  As a result, at the time the Savoy Loan reached maturity, those BankFirst employees dealing with SHP, repeatedly represented that they were prepared to extend and/or refinance the Savoy Loan, provide the construction financing that was originally anticipated when the Savoy Loan was originated, and forebear from any foreclosure, when none of that was true.  Based on these representations, SHP elected not to pursue other exit alternatives, and, in fact, believed it had validly extended the Savoy Loan for six months in accordance with its terms.

Notwithstanding those representations and knowing that it could not extend the loan, Counter-Defendants, without notice to SHP or full disclosure to the Participant Banks, sought and received permission from the Participant Banks to commence this

foreclosure action.  As a result, SHP may lose its investment in the Property – its only

asset.

      **ANSWER to 12(d):**  Each of the "persons" charged with a violation of Fla. Stat.

§ 772.103(2) in the Counterclaims is distinct from the "enterprise" whose affairs they are

charged with conducting or participating in the conduct of.

**13.**    **If the complaint alleges a violation of 18 U.S.C. § 1962(c) or § 772.103(3), Fla. Stat., provide the following information:**

    **a.**    **State who is employed by or associated with the enterprise;**

    **b.**    **Describe what each such person did to conduct or participate in the enterprise affairs;**

    **c.**    **Describe how you were directly injured by each such person's conducting or participating in the enterprise's affairs; and**

    **d.**    **State whether the same entity if both the liable "person" and the "enterprise" under the § 1962(c)/§ 772.103(3) claim.**

      **ANSWER to 13(a):**  The following individuals and entities are associated with

the enterprise: BankFirst; Marshall BankFirst Corp.; The Marshall Group; Marshall

Financial Group LLC; Ronald Sweet, Melanie Tanone; James Lund; Michael Hayes; Joel

Fisher; Richard Burnton; Dennis Mathisen; Scott Anderson; Frank Hornstein; CMA

Development Group, LLC; MOC Capital Partners, Inc.; HR Mortgage and Realty; Henry

Rodstein; and others unknown to SHP at this time.

      **ANSWER to 13(b)**:  The conduct of BankFirst, Marshall BankFirst Corp., The

Marshall Group, Marshall Financial Group LLC, Ronald Sweet, Melanie Tanone, James

Lund, Michael Hayes, Joel Fisher, Richard Burnton, Dennis Mathisen, Scott Anderson,

Frank Hornstein, CMA Development Group, LLC, MOC Capital Partners, Inc., HR

Mortgage and Realty and Henry Rodstein is described above in response to Questions 2, 3, 5 and 6.

ANSWER to 13(c):  SHP has been injured by the enterprise's actions as described in detail in response to Questions 4 and 15.

ANSWER to 13(d):  Each of the "persons" charged with a violation of Fla. Stat. § 772.103(3) in the Counterclaims is distinct from the "enterprise" whose affairs they are charged with conducting or participating in the conduct of.

**14.    If the complaint alleges a violation of 18 U.S.C. § 1962(d) or § 1962(d) or § 772.103(4), describe in detail the conspiracy, including the identity of the co-conspirators, the object of the conspiracy, and the date and substance of the conspiratorial agreement.**

ANSWER to 14:  Count Two of the Counterclaims charges each of the Counter-Defendants with participation in a conspiracy, in association with the other enterprise members, to commit the substantive violations of law alleged in Count One of the Counterclaims, namely violations of Fla. Stat. §§ 772.103(1)-(3).  In furtherance of the conspiracy, Counter-Defendants and other enterprise members committed and caused to be committed multiple incidents of criminal activity which are set forth in detail in the Counterclaim as well as in response to Question 5 above.

The Counter-Defendants, in association with the other enterprise members, conspired to engage in a wide-reaching fraudulent lending scheme whereby they used a state chartered, federally insured bank – BankFirst – to induce loans from borrowers who falsely believed that BankFirst and the other Counter-Defendants were operating legitimately.  Utilizing a network of brokers, appraisers, developers and loan originators, the Counter-Defendants generated risk-free opportunities for itself, by making whatever misrepresentations were necessary to convince potential borrowers to take out significant

87

and wholly unjustified loans (the values of which were often inflated by suspect appraisals). These misrepresentations included, but were not limited to, telling borrowers like SHP that they could proceed with such loans, including large-scale pre-development loans for commercial development projects, without providing the documentation required by state and federal banking regulations. The Counter-Defendants then lied about the material facts surrounding these loans in order to pawn them off on unsuspecting participant banks without the borrowers' knowledge or consent.

The Counter-Defendants and their co-conspirators garnered enormous fees and interest for their respective roles in originating and participating these loans, passing all of the risk to the participants and the borrowers, and ultimately to the FDIC, which insured such loans based on the misrepresentation that they complied with federal banking requirements.

The identities of the co-conspirators are set forth above in response to Questions 2 and 3. Without further discovery in this matter, SHP cannot identify the specific dates of the conspiratorial agreements. Yet, SHP believes that the conspiracy to defraud borrowers and participant banks began as early as January 2005 when Dennis Mathisen, The Marshall Group's Chairman, CEO, and majority owner, acquired BankFirst, and it continued at least until August 2, 2007, the date when the written agreement between the Federal Reserve, BankFirst and Marshall BankFirst Corp. exposed BankFirst's improper and illegal lending practices publicly for the first time.

**15.   Describe the injury to business or property.**

**ANSWER to 15:** As described above in response to Question 4, as well as in the Counterclaims, SHP was directly injured in its business and Property by the RICO law

violations committed by each of the Counter-Defendants. In particular, the fraudulent scheme and wrongful conduct perpetrated by the Counter-Defendants in association with the other members of the enterprise has devastated the viability of the redevelopment project and significantly jeopardized SHP's ability to undertake any development or structural repairs of the Property, thus irreparably damaging the value of the Property owned by SHP and injuring SHP's business in the process.[12]

In fact, but for this illegal conduct, the lucrative redevelopment project would by now be complete. At the time BankFirst initiated this foreclosure action on or about June 27, 2009, the redevelopment project was not only realistic, but it had also made considerable progress. SHP had obtained valuable, time-sensitive development rights based on approvals from the City of Miami Historic Preservation Board (the "HPB Approvals"), acquired the necessary zoning permissions, cleared outstanding title issues and secured approximately $30 million in pre-sale reservations. The approved redevelopment plan was designed to not only remedy existing structural and other deficiencies at the Savoy Hotel, but to exponentially increase the Property's value by doubling the improved square footage and replacing the current middle-market facility with a high-end luxury hotel. Given its pre-development progress, SHP had plenty of time remaining before the expiration of the HPB Approvals to submit its construction plans and secure the master building permits required to vest the HPB Approvals.[13]

---

[12] By May 2008, a Shared National Credit Report, compiled by banking regulators and provided to BankFirst and a number of the Savoy Loan Participant Banks, indicated that there was a "significant drop" in the value of the Property, rendering the value "well below the combined loan balances."

[13] Internal communications obtained during discovery make clear that the Counter-Defendants and other enterprise members knew prior to origination how crucial the HPB Approvals were to the value of the Property and that such approvals were "very difficult"

Yet, the fraudulent and illegal conduct carried out by the enterprise, which culminated with BankFirst's commencement of the instant foreclosure action, put an abrupt halt to the redevelopment project and resulted in the loss of the critical HPB Approvals necessary to make any renovations to the Property.  The enterprise's conduct, including the foreclosure action has, among other things: (i) damaged the project's goodwill, resulting in the cancellation of each and every pre-sale reservation and preventing further pre-sale reservations; (ii) prevented SHP from securing building permits necessary to begin construction before the expiration of the HPB Approvals on June 28, 2009;[14] (iii) prevented even the most modest repairs of the Savoy Hotel, decimating the value of the Property; and (iv) given rise to the commencement of multiple lawsuits against SHP by creditors associated with the redevelopment project.

Although the Savoy Hotel continues to operate, it is doing so at a significant financial deficit due to its badly outdated and deteriorated condition.  The Savoy Hotel is

---

to obtain because of the historic nature of the original buildings.  Moreover, a detailed email concerning the Property's value demonstrates that BankFirst and other enterprise members knew that the entitlement to build at "higher density" was the fundamental justification for the inflated appraisal on which the Savoy Loan was based.  Indeed, BankFirst and other Counter-Defendants were warned that without these "final binding" entitlements to increase the density, the Property's appraised value was not supportable. Following the commencement of the instant litigation, BankFirst's own expert report revealed that the loss of these excess development rights would instantly devalue the property by at least $10,000,000.00.

[14]   The HPB Approvals were originally set to expire in June 2008.  In an effort to mitigate its damages following the commencement of this foreclosure action, SHP spent a significant sum of money to apply for a one-time only extension to June 28, 2009, hopeful that the litigation could be resolved amicably and there would be enough time to finalize the building plans and commence construction so as to vest the valuable HPB Approvals.  Unfortunately, the ongoing litigation prevented SHP from obtaining necessary building permits and commencing construction before the June 28th deadline, resulting in the loss of the HPB Approvals.  Two zoning variances for the Property issued by the City of Miami Board of Adjustment likewise expired on June 28, 2009 for the same reason.

not generating positive cash flow, and an assessment by an engineering firm in March 2008 revealed that in order to continue operating as currently configured, the Savoy Hotel needs $27 million in structural and other repairs and renovations. Without the necessary improvements to cure building code violations and address structural deficiencies and other necessary repairs, the Savoy Hotel is at risk of being shut down, which would render the Property essentially worthless. Even with the completion of the repairs and renovations necessary to continue operating in its current size and configuration, a March 2008 appraisal valued the Property at no more than $28-29 million – which is well below the loan amount. Accordingly, the last known appraised value of the Property (as of the March 2008 appraisal) in its current size, configuration, and condition was approximately $1.5-2 million.

**16.    Describe the nature and extent of the relationship between the injury and each separate RICO violation.**

**ANSWER to 16:**  The relationship between the injuries suffered by SHP and the RICO violations committed by the Counter-Defendants is set forth in detail in the Counterclaims. Each RICO violation described in the Counterclaims, as well as in response to the questions above, has directly contributed to the injury suffered by SHP. To briefly summarize, the Counter-Defendants used the BankFirst entity to falsely portray themselves to SHP and other potential borrowers and other banks as a legitimate banking group governed by strict state and federal regulations. All the while, the Counter-Defendants employed unlawful means to fraudulently induce loans from SHP and other borrowers who believed the Counter-Defendants were operating legitimately and in accordance with the law, in order to collect lucrative fees from the borrowers and participant banks.

By the time the Savoy Loan was approaching maturity, this fraudulent loan scheme had begun to unravel as state and federal banking regulators descended upon BankFirst and Marshall BankFirst Corp., forcing BankFirst to stop originating, refinancing, participating and servicing loans. Rather than risk further exposure of their illegal conduct, however, the Counter-Defendants concealed the regulatory investigation and the restrictions imposed on BankFirst's ability to do business as usual, promising SHP that BankFirst was prepared to extend the Savoy Loan, provide the construction financing originally contemplated by the parties at the inception of the loan and forbear from any foreclosure. Based on these representations, SHP elected not to pursue other available financing alternatives and validly exercised its option to extend in accordance with the Savoy Loan Agreement.

Notwithstanding the representations made to SHP, the Counter-Defendants used the ruse of the loan extension and additional financing to paper the Savoy Loan files, and then abruptly accelerated the Savoy Loan and sought permission from the Participant Banks to file this foreclosure action. Despite dozens of inquiries and offers throughout the spring and summer of 2007 from third parties interested in refinancing or purchasing the Savoy Loan, BankFirst failed to communicate these offers and proposals to the Participant Banks, not to mention any of the other alternatives to foreclosure. Instead, the Participant Banks were presented with one option – a vote on foreclosure. The initiation of the foreclosure action was the final straw, rendering the injury to SHP a foregone conclusion.

The Counter-Defendants fraudulent schemes and the associated injury suffered by SHP depended on numerous instances of mail and wire fraud, in violation of criminal

statutes.  Accordingly, SHP was injured by the RICO violations alleged in the Counterclaims, both through the commission of the criminal activities described in response to Question 5 above and through the conspiracy among the Counter-Defendants and other enterprise members to conceal their unlawful activities and mislead regulators who otherwise might have acted to halt the unlawful activity.

**17.   For each claim under a subsection of § 1962 or § 772.103, list the damages sustained by reason of each violation, indicating the amount for which each defendants is liable.**

    **ANSWER to 17:**  Each of the Counter-Defendants is jointly and severally liable for damages sustained by SHP as a result of the enterprise's wrongful actions.

    As of October 17, 2008, SHP calculated its total damages to be no less than $137,433,771.00, excluding interest.  Among other things, SHP calculated its actual damages flowing from BankFirst's conduct as the loss of no less than $17,000,000.00 from the decline in the "as is" value of the Property based on the loss of the "excess development rights" associated with the HBP Approvals.  In addition, due to the timing of the foreclosure and surrounding publicity, SHP also lost $28,811.257.00 in cancelled reservations for the purchase of condominium-hotel rooms and certain residences at the time the action was filed.

    Pursuant to Fla. Stat. § 772.104, SHP is entitled to threefold damages, attorney's fees and court costs if it prevails on its RICO counterclaims.  The total damages were calculated as follows: $45,811,257.00 (actual damages) x 3 = $137,433,771.00.  The total amount, of course, is subject to change based on the potential for additional discovery reflecting special damages, including liens against SHP and other monies allegedly owed to vendors in connection with the development of the Property.  Similarly, it is premature

to calculate SHP's attorney's fees and court costs at this time.  Obviously, as the

litigation continues these costs increase.

**18.     Provide any additional information you feel would be helpful to the Court in processing your RICO claim.**

ANSWER to 18:  The adjudication of SHP's RICO claims by this Court presents

the best opportunity for the just and efficient resolution of this matter.  The Counter-

Defendants targeted SHP and other unsuspecting borrowers in this district, as well as

around the country, to further their fraudulent scheme.

Following its appointment as receiver for BankFirst, on September 2, 2009, the

FDIC removed the above-captioned action to this Court, including the RICO

counterclaims asserted by SHP against Counter-Defendants BankFirst, Marshall

BankFirst Corp., The Marshall Group and Marshal Financial Group, LLC.  Prior to

removal, this action had progressed for over two years in the Circuit Court of the

Eleventh Judicial Circuit in Miami-Dade County, Complex Business Litigation Division,

before Judge Gill Freeman.  During that time, BankFirst consistently evaded its

obligation to turn over requested documents related to SHP's RICO allegations, in

particular documents concerning its other loans.  To date, BankFirst has not turned over a

single document responsive to SHP's RICO related requests, despite being specifically

directed to do so in Magistrate Elizabeth Schwabedissen's Report and Recommendation

dated May 28, 2009 (the "May 28th R&R").  In the May 28th R&R, Magistrate

Schwabedissen specifically found that "Savoy Hotel's discovery of other BankFirst

participated loans is calculated to lead to discovery of admissible evidence of RICO

pattern and practice."  Before BankFirst was taken over by the FDIC, BankFirst filed

exceptions to the May 28th R&R, which were fully briefed and pending at the time the action was removed to this Court.

 Notwithstanding BankFirst's refusal to turn over RICO related documents that would undoubtedly bolster SHP's claims, Judge Freeman has already recognized that SHP's RICO claims, as well as the other counterclaims set forth in SHP's Second Amended Answer and Counterclaims, are legally cognizable.  On January 13, 2009, Judge Freeman denied BankFirst's motion to dismiss SHP's Second Amended Counterclaims in its entirety.  Judge Freeman also denied, on two separate occasions, BankFirst's original and renewed motions to strike the affirmative defenses set forth in SHP's Second Amended Answer.


Dated:  October 23, 2009


       Respectfully submitted,

        **AKERMAN SENTERFITT**
        Las Olas Centre II, Suite 1600
        350 East Las Olas Boulevard
        Ft. Lauderdale, Florida 33301
        Telephone:  954-463-2700
        Facsimile:  954-463-2224

   By:  /s/ Jason S. Oletsky
        **JASON S. OLETSKY, ESQUIRE**
        Florida Bar No.: 0009301
        Email: jason.oletsky@akerman.com

and

Appearing Pro Hac Vice

**KASOWITZ, BENSON, TORRES**
 **& FRIEDMAN LLP**
1633 Broadway
New York, New York 10019
Telephone: 212.506.1700
Facsimile: 212.506.1800

**MICHAEL J. BOWE**
Email: mbowe@kasowitz.com

**JENNIFER S. RECINE**
Email: jrecine@kasowitz.com

**KIMBERLY A. HORN**
Email: khorn@kasowitz.com

**J. JOHN KIM**
Email: Jyjkim@kasowitz.com

*Attorneys for Defendant*
*Savoy Hotel Partners, L.L.C.*


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on October 23, 2009, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day: (i) on all counsel of record identified on the attached Service List via transmission of Notices of Electronic Filing generated by CM/ECF; and (ii) on all other counsel identified on the attached Service List who are not authorized to receive electronically Notices of Electronic Filing by Electronic Mail.


_____/s/ Jason S. Oletsky_____
**JASON S. OLETSKY, ESQUIRE**

<u>**SERVICE LIST**</u>

FDIC v. Savoy Hotel Partners, L.L.C., et al.
IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 09-22617-CIV-GRAHAM/TORRES

**William Davis, Esq.**
Email: wdavis@foley.com
**Alan Poppe, Esq.**
Email: apoppe@foley.com
Foley & Lardner LLP
One Biscayne Tower, Suite 1900
2 South Biscayne Boulevard
Miami, Florida 33131
Telephone:
Facsimile:
*Attorneys for the FDIC,*
*as Receiver for BankFirst*

**Dirk Lorenzen, Esq.**
Email: lorenzenlaw@yahoo.com
Lorenzen Law
150 Alhambra Circle, Suite 1220
Coral Gables, Florida 33134
Telephone:
Facsimile:
*Attorneys for Intervenor SB Architects, Inc.*

**Michael Small, Esq.**
Email: msmall@foley.com
Foley & Lardner LLP
321 North Clark Street, Suite 2800
Chicago, Illinois 60654
Telephone:
Facsimile:
*Attorneys for the FDIC,*
*as Receiver for BankFirst*

**Philip D. Storey, Esq.**
Email: pds@aswmpa.com
Alvarez, Sambol, Winthrop & Madson,
P.A.
100 S. Orange Avenue
Orlando, Florida 32801
Telephone:
Facsimile:
*Attorneys for Fairwinds Credit Union,*
*Motion for Intervene Pending*

**Stephen B. Gillman, Esq.**
Email: SGillman@shutts.com
Shutts & Bowen LLP
1500 Miami Center
201 South Biscayne Boulevard
Miami, Florida 33131
Telephone:
Facsimile:
*Attorneys for Defendant Abraham Werjuka*

**Atlee W. Wampler, III, Esq.**
Email: awampler@wbwcb.com
**Ricardo A. Banciella, Esq.**
Email: rbanciella@wbwcb.com
Wampler Buchanan Walker et al.
9350 South Dixie Highway
Suite 1500
Miami, Florida 33156
Telephone:
Facsimile:
*Attorneys for Beal Bank Nevada,*
*Motion for Leave to Join Pending*